[Crim. No. 1546. In Bank.—December 21, 1910.]

## THE PEOPLE, Respondent, v. CHARLES H. LOPER, Appellant.

CRIMINAL LAW—MURDER—JURY—PEREMPTORY CHALLENGE — ERROR IN DENYING CHALLENGE FOR CAUSE.—In a prosecution for murder, the fact that all of the peremptory challenges allowed by law were exercised by the defendant makes any errors of the court in denying his challenges for cause vitally material and prejudicial to his rights.

ID.—ACTUAL BIAS—OPINION OF GUILT—QUALIFICATION OF JUROR—PROOF OF BIAS OF OPINION.—Where a talesman, upon a challenge for actual bias, admits that he has an opinion respecting defendant's guilt, but that he could put such opinion aside and try the defendant fairly and impartially, it is not necessary, under section 1076 of the Penal Code, in order to qualify him as a juror, that the prosecution should affirmatively prove that persons with whom the talesman had talked were not witnesses or interested in the action.

ID.—LACK OF KNOWLEDGE OF ENGLISH LANGUAGE.—A challenge to a juror based upon his supposed imperfect knowledge of English is one addressed to the judgment of the trial court, and its disallowance will not be disturbed unless a flagrant abuse of discretion clearly appears.

ID.—CONFLICT IN EVIDENCE ON VOIR DIRE.—It is the function of the trial court to determine the true state of mind of each member of the panel questioned as to his qualifications to serve as a juror. Where a conflict occurs during the examination on *voir dire,* the trial court must determine which of the answers most truly reveals the state of the talesman's mind.

ID.—MENTAL CONDITION — INTIMATE ACQUAINTANCE — DISCRETION OF TRIAL COURT.—An objection to a witness testifying as an intimate acquaintance to defendant's sanity, under the rule expressed in subdivision 10 of section 1870 of the Code of Civil Procedure, on the ground that he had not seen him within several years, goes more to the weight than to the admissibility of his testimony. In ruling upon the admission of such testimony, the trial judge has a wide discretion, which will not be disturbed unless obviously it has been improperly exercised.

ID.—HUSBAND AND WIFE—WITNESS—AFTER DIVORCE WIFE MAY TESTIFY AS TO MENTAL CONDITION OF HUSBAND.—Section 1322 of the Penal Code, providing that neither husband nor wife is a competent witness for or against the other in certain criminal cases, must be construed as having practically an identical meaning with section 1881 of the Code of Civil Procedure. So construed, the inhibition of testimony, after the marriage is dissolved, extends only to communications made by one to the other. Consequently, a divorced wife is not prohibited by either of such sections from testifying, as an intimate acquaintance, in a criminal prosecution against her former husband, as to his mental condition.

ID.—CONFESSION WHEN ADMISSIBLE.—A confession may not be used against a defendant unless the prosecution can show its free and voluntary character; that it was made without previous inducement, and that neither duress nor intimidation caused the defendant to make it. If threats and inducements are made to the defendant, and within a few days thereafter he makes a confession, the same may not be introduced in evidence unless it clearly appears that the threats and inducements had ceased to operate upon his mind to bring about his statement of his own guilt.

ID.—THREATS AND COERCION INDUCING CONFESSION.—In the present case it is held that the alleged confession of the defendant, under the circumstances detailed in the opinion, was the result of threats, inducements, and coercion made to and exercised over him by the sheriff and district attorney, and that its admission in evidence against him was erroneous.

ID.—EVIDENCE OF GUILT WITHOUT CONFESSION.—The error in admitting such confession necessitates a new trial, and the appellate court will not consider whether the evidence without the confession was so complete that the jury might have found him guilty even if the confession had been entirely omitted.

ID.—NOTICE PUBLISHED IN NEWSPAPER—PROOF OF PUBLICATION.—The
    original of a notice inserted by the defendant in a newspaper to the
    effect that he was winding up the affairs of the deceased, whom
    he represented as having left the state, was competent evidence, and
    a printed copy of such notice was admissible to show its actual
    publication.

ID.—PHOTOGRAPHS OF COUNTRY ABOUT PLACE OF HOMICIDE.—Photographs
    of the country between the place where the murder was claimed to
    have been committed and the place where the dismembered body of
    the deceased was found are admissible in evidence, when properly
    authenticated, for the purpose of showing the nature of the ground
    necessarily or probably traversed by the murderer and the necessity,
    or lack of it, for dismemberment of the body.

APPEAL from a judgment of the Superior Court of Fresno
County, and from an order refusing a new trial. H. Z. Austin,
Judge.

The facts are stated in the opinion of the court.

Aynesworth & Sprouse, S. J. Hinds, and Henry Brickley,
for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, for
Respondent.

MELVIN, J.—Appellant was convicted of the crime of
murder and was sentenced to receive the death penalty. He
prosecutes this appeal from the said judgment of conviction
and from an order denying his motion for a new trial. Loper,
the defendant, lived with Joe Vernet on a ranch near Sentinel
post-office in Fresno County. On July 13, 1908, Chris Peter-
son was at Vernet's cabin and when he departed he left Loper
and Vernet there together. On July 17, 1908, defendant took
the stage at Sentinel and went to Fresno, but before his de-
parture he told Mr. Rea, in the presence of the latter's mother
and sister, that Vernet had gone to Oregon, having started
the night before on the walk of thirty miles to Fresno, and
that defendant, after settling Vernet's affairs, would join him
in Oregon. After his arrival in Fresno, Loper put a notice
in a newspaper in which was a statement that he was winding
up the affairs of Joe Vernet and had authority to attend to
all necessary business. While in Fresno, Loper stated that

Vernet had gone to Oregon, leaving him to settle all business affairs. He also offered to sell certain wood belonging to Vernet, and after returning to Sentinel he collected and receipted for certain money due to that individual. He also sold a wagon and two horses from Vernet's place, and performed other acts as the ostensible agent of Vernet. On July 28th defendant was arrested, and while in custody told the sheriff that he was winding up Vernet's affairs. He also admitted that he caused the notice to be printed in the paper in Fresno. When arrested defendant had on his person two certificates of deposit in favor of Vernet on the Fresno National Bank, and a slip of paper on which was a writing supposed to be Vernet's signature. About August first the dismembered body of Joe Vernet was found buried in a hole about three eighths of a mile from the place where he and defendant had lived, and soon afterwards defendant confessed that he had killed Vernet by shooting him in the back of the head.

Insanity was the defense upon which Loper depended.

Appellant's first attack is directed against the selection of the jury. Error is alleged because of the refusal of the court to allow certain challenges proffered by defendant to individual jurors. All of the peremptory challenges allowed by law were exercised by defendant, and that fact makes the errors of the court, if any were committed in ruling upon his challenges for cause, vitally material to defendant and prejudicial to his rights. A number of the challenged talesmen admitted that they had opinions respecting defendant's guilt, and while they all testified that they could put such opinions aside and try the defendant fairly and impartially, it is contended that the prosecution failed to prove affirmatively that the persons with whom they had talked were not witnesses in the action or those deeply interested, and that therefore the opinions of the talesmen were not properly brought within the terms of section 1076 of the Penal Code. (*People* v. *Wells*, 100 Cal. 230, [34 Pac. 718]; *People* v. *Helm*, 152 Cal. 538, [93 Pac. 99].) A scrutiny of the evidence of those men called for examination as prospective jurors, however, shows either that the persons with whom they had talked were not witnesses nor interested persons, or that the opinions of the talesmen were based solely upon newspaper reports. An

earnest contention is made in the briefs that failure to make proof that the persons with whom these talesmen talked were not witnesses nor interested parties, removes the opinions of the prospective jurors from the exceptions expressed in section 1076 of the Penal Code, and that the court therefore erred in refusing to allow the challenges. We do not so understand the rule. Where it appears that a man called into the jury box has an opinion respecting the defendant's guilt, based in part upon statements of purported facts relating to the alleged crime, made to him by individuals, it must be shown, in order that section 1076 of the Penal Code may apply, that the persons who stated the supposed facts, or expressed strong belief in the defendant's guilt, were not witnesses nor interested persons, or that they were not so understood to be by the man under examination. The mere circumstance that the persons with whom he talked were or were not witnesses would be immaterial if his opinion was not founded wholly or in part on what they said, because the court is seeking to learn his mental attitude toward the defendant and the source and quality of any opinion which he may entertain. If he talked with persons understood by him to be possessed only of such information as he himself obtained from his reading, their conversation would naturally amount to public rumor so far as he was concerned. If, on the other hand, some one whom he believed would say "I saw the crime committed and know whereof I speak," the discussion by that person of the manner of the commission of the offense would almost certainly make a deep impression upon the talesman's mind and conduce to the formation of a strong opinion, even if, as matter of fact, the narration were pure fiction.

Two challenges were interposed to Theodore Linden, one based upon his supposed imperfect knowledge of English, and the other upon his admitted opinion which, according to appellant's attorneys, was fixed and was prejudicial to Loper. The first objection was one addressed particularly and peculiarly to the judgment of the trial court, and unless flagrant abuse of discretion clearly appears, rulings of that court on such a subject are seldom disturbed. We cannot say upon reading the juror's answers to the questions propounded to him that he was so deficient in his knowledge of the English

language that the court abused its discretion in refusing to entertain a challenge under subdivision 3 of section 198 of the Code of Civil Procedure. His opinion seems to have been based upon the most casual reading, and he said that he could try the case fairly and impartially, giving to the defendant the benefit of the presumption of innocence.

The statements of those called for jury duty in this case seem quite typical of those given during the selection of a jury in any case about which there has been extensive comment in the daily journals. Almost every person called into the jury box had an opinion of defendant's guilt, based upon what he had read, and some of them stated that such opinion would require evidence for its removal. When, however, they were put to the test of their ability to try the case upon the evidence produced at the trial and uninfluenced by other considerations, each answered that he could and would, if chosen, act fairly and impartially. It was the function of the trial court to determine the true state of mind of each member of the panel who was questioned touching his qualifications to serve as a juror. Frequently there is a conflict between different portions of the testimony given during an examination on *voir dire,* due not always to the lack of candor on the part of the person examined but to his misunderstanding of the questions asked and of the duties of a juror, until such duties are explained by the court. When such conflict occurs the trial court must decide, if possible, which of the answers most truly reveals the state of the talesman's mind. In other words, the questions generally presented are those of fact and not of law. (*People* v. *Ryan,* 152 Cal. 364, [92 Pac. 856]; *People* v. *Ochoa,* 142 Cal. 274, [75 Pac. 847]; *People* v. *Flannelly,* 128 Cal. 86, [60 Pac. 670]; *People* v. *Fredericks,* 106 Cal. 559, [39 Pac. 944].)

A number of witnesses testified as intimate acquaintances, to defendant's sanity, under the rule expressed in subdivision 10 of section 1870 of the Code of Civil Procedure. Objection was made to the admission of their testimony, upon the ground that some of them had not seen defendant within several years of the time of the trial. This objection goes more to the weight than to the admissibility of their testimony. All persons are presumed to be sane until the contrary is proved. Proof that defendant was sane at a time long prior to the

commission of the offense would have some tendency to estab-
lish his sanity at the time of the homicide, the weight and
value of such proof being a matter for the jury. In ruling
upon the admission of such testimony the trial judge is clothed
with a wide discretion, which will not be disturbed unless
obviously it has been improperly exercised. (*People* v. *Sues-
ser,* 142 Cal. 361, [75 Pac. 1093]; *People* v. *McCarthy,* 115
Cal. 258, [46 Pac. 1073]; *People* v. *Hubert,* 119 Cal. 221, [63
Am. St. Rep. 72, 51 Pac. 329]; *People* v. *Clark,* 151 Cal. 207,
[90 Pac. 549].) One of the witnesses who testified, as an
intimate acquaintance, to defendant's sanity, was his former
wife, now Mrs. Hendrickson. She had known him about a
year before their marriage, which had lasted about two and
a half years, although they had lived together a little more
than a year. Objection was made to Mrs. Hendrickson's tes-
timony upon the ground that she was prohibited from being
a witness by the provisions of section 1322 of the Penal Code.
That section is as follows: "Neither husband nor wife is a
competent witness for or against the other in a criminal action
or proceeding to which one or both are parties, except with
the consent of both, or in cases of criminal violence upon one
by the other, or in cases of criminal actions or proceedings
brought under the provisions of sections two hundred and
seventy and two hundred and seventy *a* of this code, or in
cases of criminal actions or proceedings for bigamy or adul-
tery." The above section must be construed as having prac-
tically an identical meaning with section 1881 of the Code of
Civil Procedure. (*People* v. *Langtree,* 64 Cal. 256, [30 Pac.
813].) Authorities have been cited on both sides; but little
assistance is to be obtained from such citations, owing to the
varied statutory provisions in the different states. In some
jurisdictions statutes are so construed that only the sort of
testimony is excluded which the statute specifically interdicts.
In others no communication made by one spouse to the other
may be stated after the marriage relation has ceased to exist,
even when the statute by its terms seems to apply the rule
only to the period of lawful matrimonial relation. Some of
the cases make an exception from the rule prohibiting one
spouse from testifying against the other, of those things which
in their nature are "as likely to have occurred before the
public as in private." (*Owen* v. *State,* 78 Ala. 429, [56 Am.

Rep. 40].)    In the case last cited the judgment of conviction
in a burglary case was reversed because the former wife of
the defendant had testified that he returned to his home late
on the night of the burglary, and that afterwards he had a
considerable sum of money in his possession.    The authorities
which recognize and those which deny the right of a divorced
wife to speak on the witness stand of matters not essentially
of a confidential nature, coming to her knowledge during the
existence of the marriage relation, are collated in *Owen* v.
*State,* 78 Ala. 429, [56 Am. Rep. 40].    Wharton writing of
this subject states the rule in civil cases thus: "Where the
relationship has ceased by death, or by divorce, the wife may
be admitted for or against the former husband or his repre-
sentatives (or the converse), though she is precluded from
testifying as to information derived confidentially during
marital intercourse.    The same distinctions are applicable to
the husband.    It is otherwise as to non-confidential informa-
tion."    (Wharton on Law of Evidence, 388; see, also,
*Gordon, Rankin & Co.* v. *Tweedy,* 71 Ala. 210.)    Professor
Greenleaf thus formulates the rule: "After the parties are
separated, whether it be by divorce or by the death of the
husband, the wife is still precluded from disclosing any con-
versations with him, though she may be admitted to testify to
facts which came to her knowledge by means equally acces-
sible to any person not standing in that relation."    (1 Green-
leaf on Evidence, 16th ed., p. 393.)    Again, treating of the
subject of marital confidences, the same learned author ob-
serves (p. 497) : "But where such confidences are not in-
volved, the policy of preserving the marital peace does not
forbid one spouse from testifying against the other's interests
after the latter's death or divorce."    While the problem here
considered is a matter of first impression in California, this
court declared years ago in favor of the liberal construction of
section 1322 of the Penal Code and the admission of testi-
mony not clearly excluded by its terms.    In *People* v. *Lang-
tree,* 64 Cal. 256, [30 Pac. 813], decided in 1883, the court in
Bank adopted with approval the following language of Mr.
Schouler: "On the whole, the prevailing tendency of late
years in both England and America is to regard the domestic
confidence or the ties of a spouse as of little consequence com-
pared with the public convenience of extending the means of

ascertaining the truth in all cases; such facilities being increased, it is believed, by hearing what each one has to say, and then making due allowance for circumstances affecting each one's credibility." (Schouler on Husband and Wife, 85.) It will be noticed that, construing section 1322 of the Penal Code and section 1881 of the Code of Civil Procedure together, the inhibition of testimony extends to communications made by one to the other. Mental condition is not a matter of communication and in view of the broad rule adopted in *People* v. *Langtree,* 64 Cal. ·256, [30 Pac. 813], we are constrained to hold that the testimony of this witness was admissible.

After his arrest, the defendant was submitted to a rigid examination by the sheriff, the district attorney, and others. On the following morning he made a confession, which his counsel contend was due not to his own voluntary impulse, but resulted from this close examination, characterized by them as "a relentless sweating process." The questions propounded to the defendant were reported, and a transcript, admittedly correct in every particular, was introduced in evidence, defendant's counsel making only the objection that the reported conversation was inadmissible as it was induced by threats, the effect of which must have extended to and operated to obtain the subsequent confession. A careful consideration of this matter convinces us that the criticism made by appellant's counsel is just. The transcript does not show that at any time the defendant was instructed with reference to his rights under the constitution, nor was he told that statements made by him might be used against him at his trial. During the long and searching examination to which he was subjected he did not make a confession, but he admitted that if he did kill Vernet the deed must have been accomplished while he was drunk—that his mind was a blank upon the entire subject. It is a fundamental rule of criminal law that a confession may not be used against a defendant unless the prosecution can show its free and voluntary character; that it was made without previous inducement; and that neither duress nor intimidation caused defendant to furnish such evidence against himself. (*People* v. *Miller,* 135 Cal. 69, [67 Pac. 12].) It is also true that if threats and inducements are made to a prisoner, and within a few days thereafter he makes a con-

fession, such acknowledgment of the commission of the crime may not be introduced in evidence unless it clearly appears that the threats and inducements had ceased to operate upon his mind to bring about his statement of his own guilt. (*People* v. *Johnson,* 41 Cal. 455.) After the searching inquiry of the sheriff, district attorney, and deputy district attorney had closed, defendant was locked up in solitary confinement until the following morning, when he informed the sheriff that he desired to tell everything. Undoubtedly there was strong probability that the occurrences of the previous day had much to do with fixing defendant's final resolution to confess, and if coercive threats were made and inducements offered, then we must, in the absence of a contrary showing, find that the confession made on the following day was inadmissible as evidence. The manner of examination to which defendant was subjected may best be understood perhaps from a reading of the following quotations from the transcript:

"Mr. Hawson: Q. Where were you when you cut the legs off of Joe Vernet?

"A. I don't know about that at all.

"Q. What did you cut them off with?

"A. Good God, is Joe dead?

"Mr. Chittenden: You know he is dead.

"A. I do not. If I ever told the truth in my life, I didn't know he is dead. There is no man in the world that would feel worse on his loss than I do. He is the only friend I have.

"Mr. Hawson: You are the most monumental liar I ever knew. . . . How long did you leave the body in the cabin? Confess up and tell the truth entirely; the sooner you tell the truth about this, the better your mind will be. I don't blame you for not wanting to tell this; this is an awful strain, but when you make this confession you will be a better man; you will feel better in two minutes, just that quick.

"A. I don't see how I can.

"Q. Go on and tell us the story, you will feel better and different, and if you have done wrong, go on and be a man. . . .

"Mr. Church: As far as I am concerned, personally, as district attorney, I don't care whether you say anything or not. The evidence is absolutely and complete against you unless you want to implicate any one else, the only way you can do

yourself any good in the world, if there was any one else in it is to tell it.

"A. I will tell you there was no one in it, and Joe was going to Portland, Oregon. . . .

"Q. Who was with you in that trick?

"A. I have told you all about it.

"Q. I thought you did it all alone. I thought if you didn't it would be an advantage to you personally to let us know who it was, is all. I thought it would perhaps . . .

"Mr. Church: I don't suppose there was ever a murder committed in the history of the world like this, just for his money and certificates of deposit and then killed by a man who pretends to be his friend, just for money. It is terrible.

"Mr. Chittenden: I want him to tell it. It would make him feel better.

"A. Don't you think if I had done that, there would be some impression on my mind, there would be something to show to my mind I done it?

"Mr. Church: Certainly.

"A. And there has never been anything.

"Q. I thought it was a cool calculated piece of work. He has had it on his mind for a year. I think I have figured it out. How he could murder him, and then get out for good. He had no wife. If you have a wife, I would like for you to tell me.

"A. No.

"Q. You couldn't pay your board bill. He boarded you for a year, you borrowed money of old Joe, and in the face of these things he had gone down in his pocket and loaned you money, you couldn't pay your board bill, you hadn't done an honest day's work in months, you could get no work to do and even in the face of all this you took poor old Joe and butchered him in the same manner as you would have butchered a hog, and you tell us in all soberness, your mind is a blank, and hasn't been a blank before that time?

"Mr. Chittenden: There are hundreds of people up there that know him. I think he has been in this line of work for a year. The people up there can tell if his mind has been in a blank, and to think he cut him up and buried him is all bosh. I have got mountains of proof, there isn't anything to it at all, there isn't anything in the case, it has been the easiest

thing in the world to hunt, and then for you to sit here and tell us you don't know anything about it—If you want to live in that frame of mind, if you want to live that way—what you are facing at this time right now—I thought it would probably relieve your mind—to have that awful truth told.

"A. I would tell if I could, but I don't see that I done it.

. . .

"Q. (By Mr. Hawson) : If you didn't do it, who knows you done it. It was done right at your door in your house?

"A. It looks to me if I done that terrible crime there would be something on my mind.

"Q. There is something. You have got a load right now. It is as big as that courthouse, standing right there. It is heavier than this jail and the only reason I want you to tell me the truth. There is absolutely nothing to the case, it might be a relief to your mind. Your mind is a little clearer then than it is now, I tell you.

"Mr. Hawson: If you had been up there yesterday afternoon and seen them dig up that body, some thirty or forty men who knew Joe Vernet, you wouldn't have had five minutes to tell anything.

"Sheriff Chittenden: If I had come back and got you—you didn't have any friends up there—they would have strung you up to the first tree, Charlie Loper—a piece of rope would have got to your neck.

"A. If I had done that deed they might do it.

"Q. You did the deed all right.

"A. There is nothing in my mind about the thing."

That the rule excluding confessions unless they are free and voluntary was violated in admitting the alleged confession after such proof of threats, inducements, and coercion, can scarcely admit of a doubt. It has been held in this state that it was sufficient to exclude a confession if before making it the defendant had been told that it would be better for him to make full disclosure. (*People* v. *Barrie,* 49 Cal. 344.) In *People* v. *Thompson,* 84 Cal. 605, [24 Pac. 386], a confession was held inadmissible because the sheriff had told the prisoner that he "didn't think the truth would hurt anybody," and that "it would be better for him to come out and tell all he knew about it if he felt that way." The question whether a confession is free and voluntary is a preliminary one ad-

CLIX Cal.—2

dressed to the trial court (*People* v. *Miller*, 135 Cal. 69, [67 Pac. 12]), and that court is clothed with a considerable amount of discretion in determining it (*People* v. *Suesser*, 142 Cal. 361, [75 Pac. 1093]), but we know of no case in which such potential influences as are shown by this record have been held harmless and not sufficient to exclude the confession induced by them. So long as the constitutional privilege of a defendant not to give evidence against himself exists, that right must be protected by adherence to the well-established rule intended to guard against undue advantage being taken of his fears, hopes, or mental or physical weakness; and while many thoughtful persons believe that those charged with crime should be compelled either to testify or to bear an adverse presumption as the result of refusal to take the witness stand, no advocate of that change in the law, we believe, goes so far as to desire the machinery of compulsion to be applied anywhere except in the full publicity of open court. In a recent public address, speaking upon this subject, and advocating a change in the rule whereby a defendant is now enabled to refrain from testifying, Mr. Justice Sloss said:

"Side by side with the limitation of the right of the accused to stand mute should go the absolute prohibition of testimony or confessions obtained from persons under arrest as the result of private questioning by officers of the law. The horrors of the 'third degree' are the direct result of the rule prohibiting the prosecution from calling the accused as a witness, or basing any argument upon his failure to take the witness stand in his own behalf. Surely it is far better to question the accused in open court, where he may have the assistance of counsel and the protection of an impartial judge, than to endeavor to convict him by means of an alleged confession which may never have been made and which, if made, may have been extorted from him in ways that, if known, would throw great doubt upon its reliability."

In *Bram* v. *United States,* 168 U. S. 532, [18 Sup. Ct. 183], the leading authorities upon the subject of confession are collated and discussed masterfully in the opinion of the court delivered by Mr. Justice White. In that opinion he says: "A brief consideration of the reasons which gave rise to the adoption of the fifth amendment, of the wrongs which it was intended to prevent and of the safeguards which it was its

purpose unalterably to secure, will make it clear that the generic language of the amendment was but a crystallization of the doctrine as to confessions, well settled when the amendment was adopted, and since expressed in the text-writers and expounded by the adjudications, and hence that the statements on the subject by the text-writers and adjudications but formulate the conceptions and commands of the amendment itself." In another part of the opinion he observes that: "There can be no doubt that long prior to our independence the doctrine that one accused of crime could not be compelled to testify against himself had reached its full development in the common law, was there considered as resting on the law of nature, and was embedded in that system as one of its great and distinguishing attributes." He also quotes with approval part of the opinion of the same court, delivered by Mr. Justice Brown in the case of *Brown* v. *Walker,* 161 U. S. 596, [16 Sup. Ct. 646]. As that quotation, we think, fully illustrates the historical significance of the rule which we have been discussing, we take this opportunity of repeating it: "The maxim *Nemo tenetur seipsum accusare* had its origin in a protest against the inquisitorial and manifestly unjust methods of interrogating accused persons, which has long obtained in the continental system, and until the expulsion of the Stuarts from the British throne in 1688, and the erection of additional barriers for the protection of the people against the exercise of arbitrary power, was not uncommon even in England. While the admissions or confessions of the prisoner, when voluntarily and freely made, have always ranked high in the scale of incriminating evidence, if an accused person be asked to explain his apparent connection with a crime under investigation, the ease with which the questions put to him may assume an inquisitorial character, the temptation to press the witness unduly, to browbeat him if he be timid or reluctant, to push him into a corner, and to entrap him into fatal contradictions, which is so painfully evident in many of the earlier state trials, notably in those of Sir Nicholas Throckmorton, and Udal, the Puritan minister, made the system so odious as to give rise to a demand for its total abolition. The change in the English criminal procedure in that particular seems to be founded on no statute and no judicial opinion, but upon a general and silent acquiescence of the courts in a popular

demand. But, however adopted, it has become firmly embedded in English as well as American jurisprudence. So deeply did the iniquities of the ancient system impress themselves upon the minds of the American colonists that the States, with one accord, made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment."

It is suggested that the evidence in this case was so complete without the confession of the defendant that the jury would have found him guilty even if the confession had been entirely omitted. While this argument serves to emphasize the lack of excuse for the resort on the part of public officers to the methods of the "third degree," it does not abate one whit the defendant's right to all of his constitutional privileges. He was entitled to stand mute, if he chose to do so, and to have no confession save a voluntary statement—one not extorted by fear nor induced by promises—introduced against him at his trial. Of this right he was deprived. Without instruction as to the law applicable to his case, without advice of counsel, without knowing that his utterances might be used against him, he was cajoled, browbeaten, and persuaded; was called "a monumental liar"; was told that Vernet's friends would have hanged him "to the first tree," if the sheriff had taken him to the place where the dead body was found; and, in short, every sort of device was employed to force a confession from him. Then, to enable these persuasions to sink deeply into his mind he was solitarily confined for the night. To say that the confession of the following morning was not influenced by the conduct and the conversation of the officers, would be to contradict all human experience. And it is equally untenable to say that because the prosecution had a perfect case without the confession, the jury would have imposed the ultimate penalty of the law upon the defendant, whether that confession had been excluded or admitted. No one could say (not even the jurors themselves) just what weight the confession had in fixing the belief of the jury in Loper's guilt, and especially in shaping a verdict involving capital punishment. But every one must conclude that the introduction of the defendant's own statement of his guilt

under the circumstances here shown, must have been most highly prejudicial to him. It follows that for this reason a new trial must be ordered.

Objection is made that a printed copy of a notice published in a Fresno paper purporting to be signed by Joe Vernet and authorizing Loper to settle Vernet's business affairs was introduced in connection with the testimony of Rufus Morrell. It is admitted by appellant's counsel that the original of this notice which the district attorney promised, when examining Morrell, to produce later would be competent. With this we agree, and we think it follows that evidence was admissible showing actual publication of the notice after its preparation and its filing in the office of the newspaper.

Objection is also made to the ruling of the court admitting certain photographs in evidence. These pictures illustrated the country between Vernet's cabin and the place where the dead body was discovered. They were clearly admissible for the purpose of showing the jury the nature of the ground necessarily or probably traversed by the murderer, and especially for exhibiting the necessity (or lack of it) for dismemberment of the body. Photographs are admissible, when properly authenticated, just as are other illustrative charts. (*People* v. *Durrant,* 116 Cal. 213, [48 Pac. 75] ; *People* v. *Crandall,* 125 Cal. 133, [57 Pac. 785] ; *People* v. *Mahatch,* 148 Cal. 203, [82 Pac. 779].)

We find no material errors in the matter of giving or refusing instructions. Most of appellant's criticisms are directed at instructions upon the subject of insanity. The jury was fully and fairly instructed upon this phase of the case.

It follows from the above discussion that the judgment and order must be reversed and it is so ordered.

Henshaw, J., Lorigan, J., and Beatty, C. J., concurred.

ANGELLOTTI, J., dissenting.—I am unable to concur in the reversal of the judgment and order in this case. The reversal is ordered solely because of the admission in evidence of the so-called confession of defendant, wherein, while admitting the actual killing, he described how it was compelled by an absolutely irresistible influence commanding him to kill that had been threatening him for days and that had finally

dominated him. This statement is held to have been improperly admitted, on the ground, as we understand the opinion, that it is a confession obtained by threats, intimidation, coercion, and duress. There is no other possible ground of exclusion shown by the record. The law does not require that an accused should be affirmatively instructed as to his right to remain silent and of the fact that statements made by him will be used against him, to render admissible a voluntary statement subsequently made. While it is better that such warning be expressly given to avoid all suspicion of improper inducement, it is not essential. The evidence of the long interview between the officers and the defendant shows beyond question that no improper inducement was held out to defendant to make the statement, no promise or intimation that it would be in any way better for him so far as his treatment by the officers or by the court or by any other person or persons was concerned, no statement even that it would be "better" for him, except in the event that some one else was implicated, and that the only thing in the way of an expression of opinion by any officer that it would be beneficial to defendant to confess the truth was expressly limited to the effect on defendant's mind—the relief from the strain of knowledge of unconfessed guilt of an atrocious crime. So that we are left, in excluding this statement, to the objection that it was obtained by threats, coercion, intimidation, and duress. While I do not desire to be understood as approving all that was said and done by the officers with relation to defendant, I do not think that it should be held that the trial court erred in its conclusion that the statement was voluntary. No threats were shown. The question of fact whether the statement was the result of coercion, intimidation, or duress exerted by the officers, was one for the trial judge in the first instance, and we should not interfere with his conclusion thereon unless the same be without substantial support in the evidence. In my opinion the conclusion of the trial judge was sufficiently supported by the evidence.

Shaw, J., and Sloss, J., concurred.

Rehearing denied.