[Crim. No. 1193. First Appellate District, Division One.—October 20, 1924.]

## THE PEOPLE, Respondent, v. ELIZA POTIGIAN, Appellant.

[1] Criminal Law — Murder — Publication of Derogatory Statements in Newspapers—Enraged Public Sentiment—Change of Venue—Discretion of Trial Court.—In this prosecution for murder, although the uncontradicted affidavits on behalf of defendant showed that immediately following defendant's arrest and frequently thereafter several newspapers printed and largely circulated in the county published articles seriously derogatory of defendant —she having been accused of eight separate crimes, and having been constantly referred to as "triple murderess," "Bluebeard woman," "poison woman," "woman murderer," "modern Borgia," etc.—and it was shown further that among people of her own race there had been passionate attacks against defendant, she having been excoriated in public sermons and in street talk, it was not error to deny his motion for a change of venue where the trial court, in the exercise of sound discretion, found that notwithstanding those facts she could secure a fair trial in the county.

[2] Id.—Conflicting Affidavits—Appeal.—Grounds urged in support of a motion for change of venue, but which involve debatable issues of fact raised by counter-affidavits, are not to be considered on appeal.

[3] Id.—Consolidation of Indictments—Discretion of Trial Court. In this prosecution for murder, the consolidation of two murder indictments found against defendant—the one under which she was convicted, wherein her stepdaughter was named as the person slain, with another charging her with the murder of her husband— did not constitute error; and the trial court was not required to predicate its determination of the motion for the consolidation upon facts formally brought to the notice of the court, as the two indictments, the close relation between the criminal acts charged in each, and the general atmosphere of the situation necessarily known to the court were "facts" before the court which could have been, and doubtless were, considered.

1. Weight of newspaper articles as evidence of prejudice against accused entitling him to change of venue, note, 18 Ann. Cas. 789. See, also, 27 R. C. L. 816; 7 Cal. Jur. 917.

2. See 27 R. C. L. 827; 7 Cal. Jur. 920.

3. Right to try defendant on two or more indictments at one time, note, Ann. Cas. 1913A, 1005. See, also, 8 R. C. L. 166; 8 Cal. Jur. 193.

[4] ID. — OBLIGATION TO BELIEVE DEFENDANT'S AFFIDAVITS — OPINION EVIDENCE—PROVINCE OF TRIAL COURT.—In such proceeding, the trial court was not obligated to accept as true the contents of defendant's affidavits filed in support of her objection to a consolidation; and what therein was said to the effect that a strong then existing public prejudice against defendant would be intensified by joinder of the cases was, in the ultimate analysis, a matter of opinion, as to which the trial court was entitled to exercise its own judgment.

[5] ID. — GUILT OF DEFENDANT — OPINION BASED ON STATEMENTS OF OTHERS—DISQUALIFICATION OF JUROR.—Where it appears that a man called into the jury-box has an opinion respecting the defendant's guilt, based in part upon statements of purported facts relating to the alleged crime, made to him by individuals, it must be shown, in order that section 1076 of the Penal Code may apply, that the persons who stated the supposed facts, or expressed strong belief in defendant's guilt, were not witnesses nor interested persons, or that they were not so understood to be by the man under examination.

[6] ID.—PREFERENCE FOR PEOPLE OF OWN NATIONALITY—DISQUALIFICATION OF JUROR.—The fact that the defendant was an Armenian and that said person called into the jury-box stated, in effect, that he liked Americans a little more than he liked Armenians, taken in conjunction with many other statements indicative of his unbiased frame of mind toward the defendant, did not disqualify said person as a juror.

[7] ID.—DEATH FROM ARSENICAL POISON—GUILT OF DEFENDANT—EVIDENCE—VERDICT.—In this prosecution for murder, there was ample evidence tending to prove that the deceased died from arsenical poison, administered by defendant with murderous intent, and this evidence was sufficient to warrant the jury in finding a verdict of guilty as charged in the indictment.

[8] ID. — ADMISSION OF GRAPE JUICE CONTAINING ARSENIC — CONNECTION WITH DEFENDANT—EVIDENCE—WEIGHT.—In this prosecution for murder, the trial court did not err in receiving in evidence (over defendant's objection that they were not connected in any legal way with her) several bottles of vinegar grape juice, in which arsenic was found, where the bottles were found in the basement of the house in which defendant and family had lived for several

5. See 16 R. C. L. 265, 271; 15 Cal. Jur. 369.

6. Bias or prejudice which disqualifies one as juror, note, 9 Am. St. Rep. 744.

Prejudice against race or color as disqualifying juror, notes, Ann. Cas. 1912B, 969; Ann. Cas. 1917C, 1167. See, also, 16 R. C. L. 270.

8. See 8 R. C. L. 181; 8 Cal. Jur. 141.

years, and there was substantial testimony that from year to year defendant had "put up" grape juice in bottles, and the vinegar grape juice was found where defendant, as housewife, would naturally have placed and kept it; and the interval of eight or ten days between defendant's arrest and absence from the premises and the finding of the bottles, during which time someone other than defendant may have placed arsenic in them, was a fact affecting the weight, but not the competency, of the evidence.

[9] ID. — WILL-FREE CONFESSION — ABSTENTION FROM FOOD. — In such prosecution, the trial court did not err in admitting in evidence a confessional statement made by defendant where it was shown that at the time she made the self-incriminatory statement she was will-free, and not acting under coercion or duress; and her voluntary abstention from food during the entire day preceding the making of such statement did not affect the admissibility thereof.

[10] ID. — CAUSE OF DEATH — EXPERT EVIDENCE — OPINION OF PHYSICIAN. — A physician may testify as an expert, touching cause of death, basing his opinion upon special knowledge acquired from professional study, even though he may have had no practical experience in cases of the kind concerning which he testified.

[11] ID. — TRIAL UPON TWO CHARGES — PEREMPTORY CHALLENGES ALLOWED. — The fact that a defendant is put upon trial charged with two capital offenses does not entitle him to twenty peremptory challenges as to each offense charged.

---

(1) 16 C. J., p. 204, sec. 306. (2) 17 C. J., p. 233, sec. 3577. (3) 16 C. J., p. 782, sec. 2004. (4) 16 C. J., p. 783, sec. 2004 (Anno.). (5) 35 C. J., p. 342, sec. 372 (Anno.). (6) 35 C. J., p. 329, sec. 349. (7) 30 C. J., p. 290, sec. 536, p. 296, sec. 540, p. 312, sec. 559. (8) 16 C. J., p. 618, sec. 1225. (9) 16 C. J., p. 721, sec. 1474 (Anno.). (10) 30 C. J., p. 220, sec. 448 (Anno.). (11) 35 C. J., p. 414, sec. 474 (Anno.).

APPEAL from a judgment of the Superior Court of Fresno County and from an order denying a new trial. S. L. Strother, Judge. Affirmed.

---

9. Confessions, when admissible, notes, 30 Am. Dec. 544; 46 Am. Rep. 253; 6 Am. St. Rep. 242. See, also, 1 R. C. L. 559, 562; 8 Cal. Jur. 110–113.

10. Who are expert witnesses, note, 66 Am. Dec. 228.

Competency of physician as expert where has not had similar case, note, 14 Ann. Cas. 137. See, also, 8 Cal. Jur. 159.

Nature and subject matter as affecting admissibility of expert opinions in general, note, L. R. A. 1915A, 1058.

11. See 15 Cal. Jur. 434.

The facts are stated in the opinion of the court.

Philip Conley and Lindsay & Conley for Appellant.

U. S. Webb, Attorney-General, Wm. F. Cleary, Deputy Attorney-General, Geo. R. Lovejoy, District Attorney, Denver S. Church, Assistant District Attorney, and Gilbert H. Jertberg, Deputy District Attorney, for Respondent.

CABANISS, P. J., *pro tem.*—This is an appeal from a judgment of conviction (murder in the first degree) and from order denying defendant's motion for a new trial.

[1] Appellant insists that the court erred in denying her motion for a change of venue. It is made manifest by uncontradicted affidavits that immediately following defendant's arrest and frequently thereafter, several newspapers printed and largely circulated in Fresno County, published articles seriously derogatory of her. These publications are thus epitomized by appellant's counsel: "Defendant was accused of eight separate crimes, and was constantly referred to by such terms as 'triple murderess,' 'Bluebeard woman,' 'poison woman,' 'woman murderer,' 'mystery woman,' 'modern Borgia,' " etc.

"The alleged facts in the case were printed time and time again, being vouched for according to the newspaper statements by the District Attorney, the Assistant District Attorney, several Deputy District Attorneys," etc. "It was further shown among the Armenians themselves [appellant being an Armenian] there had been passionate attacks directed against the woman, she having been excoriated in public sermons and in street talk."

We must conclude that the trial court in the exercise of a sound discretion, found that, notwithstanding these publications, defendant could secure a fair trial in Fresno County; and therefore defendant's contention is not sustainable.

[2] It is sufficient to say of the other grounds urged in support of change of venue motion, that they involve debatable issues of fact, raised by counter-affidavits, and for that reason, are not to be considered.

[3] Appellant charges error because of the consolidation of two murder indictments found against her—the one under which she was convicted, wherein appellant's stepdaughter,

Margaret Potigian, is named as the person slain, with another charging her with the murder of her husband.

As this point involves a construction of section 954 of the Penal Code, we quote so much thereof as is pertinent: "The indictment or information may charge . . . two or more different offenses of the same class of crimes or offenses. . . . and if two or more indictments or informations are filed in such cases the court may order them consolidated."

The crimes charged in the two indictments are obviously of the same class and the only question is, Did the court, in ordering a consolidation, abuse its discretion to defendant's prejudice? It is ingeniously argued by appellant's counsel that the court in determining the motion for consolidation against defendant's objection was required to exercise a sound discretion; and this the court could not have done, inasmuch as no facts were presented and without which the court could not have acted advisedly as, quoting appellant's counsel, "in order to exercise a sound discretion a court must base its action upon facts properly and legally brought before it." True, no facts were formally brought to the notice of the court in support of the motion. Yet the two indictments, the close relation between the criminal acts charged in each, and the general atmosphere of the situation necessarily known to the court were "facts" before the court which could have been, and doubtless were, considered. [4] Nor was the court obligated to accept as true the contents of defendant's affidavit filed in support of her objection to a consolidation. What therein is said to the effect that a strong then existing public prejudice against defendant would be intensified by joinder of the cases is, in the ultimate analysis, a matter of opinion as to which the court was entitled to exercise its own judgment. For these reasons we believe appellant's contention to be untenable.

Immediately after the jury had been sworn to try both charges, the court, upon motion of defendant, and for reasons with which we are not concerned, ordered that the trial proceed under one indictment only; whereupon the district attorney elected to try defendant upon the first of the two above-named indictments.

[5] Appellant also charges error in the disallowance of her challenge for cause, directed against Juror Wallace, in that his opinion concerning the case, for aught the record

shows to the contrary, may have been based on statements made to him by witnesses or parties interested in the case. Wallace's statement, relevant to this issue, was that he did not know in what way the persons with whom he had conversed could be witnesses, though he would not make a positive statement that they were not such; "we discussed the facts as we did any news, like the Tea Pot Dome scandal or any other." Wallace is thus shown to have understood that his informants spoke not as witnesses but from hearsay; for which reason it is immaterial what the *fact* in that regard may have been.

"Where it appears that a man called into the jury box has an opinion respecting the defendant's guilt, based in part upon statements of purported facts relating to the alleged crime, made to him by individuals, it must be shown, in order that section 1076 of the Penal Code may apply, that the persons who stated the supposed facts, or expressed strong belief in the defendant's guilt were not witnesses nor interested persons, *or that they were not so understood* to be by the man under examination." (Italics are ours.) (*People* v. *Loper,* 159 Cal. 6 [Ann. Cas. 1912B, 1193, 112 Pac. 720].)

The trial court was warranted in holding Wallace's attitude toward the case to be such as did not disqualify him as a juror. He had read and conversed concerning the case and formed only such qualified opinions adversely to defendant as any reasonably intelligent man would have done under like circumstances, and that, too, without precluding him from acting as an impartial juror. [6] It is further insisted that Juror Wallace entertained a feeling against Armenians which constituted grounds of challenge for cause. This objection is based upon the following questions asked Wallace and his answers thereto: "Q. Well, now have you any feeling towards the Armenians or against them or strongly in favor of them? A. I am not in favor of them exactly, no. Some of them I might have a little prejudice against and others I haven't. Q. As a whole, as a class? A. I might have just a little bit more than I would an American, something like that." The context demonstrates that this juror did not advisedly use the word "prejudice"; his understanding and use of the word, translating it into simple terms is that he "liked" Americans a little more

than he "liked" Armenians. This slight preference to those of his own nationality as against those of any other nationality or race, taken in conjunction with many other statements indicative of his unbiased frame of mind toward the defendant does not, we think, disqualify him as a juror.

[7] Reversal is asked upon the ground that the evidence is insufficient to warrant the verdict. There is ample evidence tending to prove that Margaret Potigian died from arsenical poison, administered by appellant with murderous intent. This being so, we need not further consider the matter, and yet in deference to appellant's able counsel and because a life imprisonment sentence is here involved we will comment so far as need be upon the testimony. The attending physician under whose observation and care Margaret Potigian continuously was for two months prior to and until her death, though unable at the outset to diagnose her condition as due to arsenical poisoning, later did so and treated her accordingly. The doctor enumerates several symptoms of arsenical poisoning observed by him during the patient's illness which combined would seem to strongly support his positive opinion as to the cause of death. He further testified that the condition of certain organs of the deceased disclosed at the autopsy tended to show arsenical poisoning as the cause of death. The testimony of Doctor Dickinson as to symptoms and post-mortem condition is appreciably corroborated by that of Doctor Sample. Against the testimony of these two medical gentlemen is chiefly that of defendant's witness, Doctor Edwin L. Bruck. This gentleman specializes "in the diagnosis and treatment of internal disease," which, together with his thorough schooling in medicine, entitles his opinion to profound respect.

Appellant's counsel submitted to Doctor Bruck an elaborate hypothetical question embracing a full history of Miss Potigian's illness and so forth and sought his opinion as to "the cause of the death of the patient." The answer was, "That is pretty hard to give, a very positive answer on such a thing, I am sure." When asked, "For what reason, Doctor?" he replied, "Because, never having seen the patient it is very hard to segregate the symptoms that are given here into any definite form which would indicate any particular diagnosis. There are, however, several possibilities which come to mind." The witness did, however, give

further testimony tending to refute the arsenical poisoning
theory.

These references to the medical testimony clearly indicate
that the jury was warranted in finding the cause of Miss
Potigian's death to be that assigned by the people's wit-
nesses—i. e., arsenical poisoning administered with intent to
bring about her death. In other words, naturally and logi-
cally the jurors gave credence to the opinions of the medical
gentlemen who had diagnosed and treated the patient rather
than to the opinion of the medical expert who, as he frankly
admits, was handicapped in forming a theory as to the cause
of death, "because of never having seen the patient."

We are also of the opinion that the evidence fully supports
the verdict. In this connection it will suffice to point out
two salient facts which make strongly against appellant. It
is shown that appellant entertained toward Margaret Poti-
gian, her stepdaughter, a bitter hatred, expressing itself in
vile epithets applied to her and oft-repeated threats "to
rain dust upon them," "to rain poison upon them," and to
exterminate the whole family, including Margaret Potigian.
It would serve no useful end to further detail the language
and threats mentioned; it is enough to say that they evidence
a deep-seated and implacable hatred and murderous purpose,
engendered by appellants' belief that her husband had made
a last will and testament which unduly favored Margaret
Potigian to the prejudice of appellant. It was also shown
that appellant admitted having placed poison in food pre-
pared as part of the family meal with a view to poisoning
herself, Margaret, and her brother. It may be parenthet-
ically added that the testimony further shows that on the
occasion named by appellant, the two children became
seriously ill, the symptoms being suggestive of poisoning—
their recovery being due to prompt medical aid.

There is in the record other testimony also bearing against
defendant which we do not think it needful to set forth
herein.

[8] It is contended that the court erred in receiving in
evidence several bottles of vinegar grape juice, in which
arsenic was found, because they "were not connected in any
legal way with the defendant."

The bottles were found in the basement of the house in
which defendant and family had lived for several years.

There is substantial testimony that from year to year defendant had "put up" grape juice in bottles, and the vinegar grape juice was found where the defendant, as housewife, would naturally have placed and kept it. This, we think, tends somewhat strongly to connect defendant with the bottles and their contents. The interval of eight or ten days between defendant's arrest and absence from the premises, and the finding of the bottles, during which time someone other than herself may have placed arsenic in them, was a fact affecting the weight, but not the competency, of the evidence.

[9] It is also urged that the court erroneously admitted evidence of a confessional statement, made by defendant under the following circumstances: The defendant was arrested early in the morning, taken to jail, kept there throughout the day, not informed as to any of her rights, and "subjected to a bombardment of questions and insinuations by official after official," many of whom were present. Defendant was arrested early in the morning and had not breakfasted, nor eaten at all during the day prior to making the statement at about 4 o'clock in the afternoon—she having declined the matron's invitation to eat and drink.

The defendant, when she made the self-incriminatory statement, was will-free; her voluntary abstention from food during the entire day was natural to one in her perturbed state and is to be ignored. No element of coercion or duress is shown, and therefore her statement was admissible.

[10] It is contended that one of two medical gentlemen who gave opinions as to the cause of Margaret Potigian's death was not shown to be an expert, because "there was no qualification with regard to experience in connection with poisoning cases or arsenical poisoning prior to the admission of this evidence."

A physician may testify as an expert, touching cause of death, basing his opinion upon special knowledge acquired from professional study, even though he may have had no practical experience in cases of the kind concerning which he testified.

In support of this view it is sufficient to cite *Estate of Toomes*, 54 Cal. 513 [35 Am. Rep. 83], and especially excerpt from "Best on Evidence," therein approvingly quoted.

[11] Appellant, having exhausted twenty peremptory challenges, sought, but was not permitted, to use another "peremptory." Appellant's argument is that section 1070 of the Penal Code allows the defendant twenty challenges where the offense charged is punishable with death or state prison for life; therefore appellant put upon trial charged with two capital offenses is entitled to twenty peremptory challenges as to each offense charged.

The only case cited from our court (*People* v. *Howard*, 31 Cal. App. 358 [100 Pac. 697]) militates strongly against appellant's theory, as there defendant was tried under indictment charging three separate offenses and judgment was affirmed.

Appellant's counsel insists that the Howard case has no application to the instant case. The two cases are akin in one significant regard. In the former the information was in "three counts each stating a different offense"; in the latter two offenses are stated. The circumstance that the indictment in the Howard case did not charge "offenses separated in time" does not, in our opinion, materially distinguish it from the instant case.

Judgment and order denying defendant's motion for a new trial affirmed.

Knight, J., and St. Sure J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 18, 1924.

All the Justices concurred.