[Crim. No. 1716.  In Bank.—June 14, 1913.]

## THE PEOPLE, Respondent, v. EDWIN JAMES WATSON, Appellant.

CRIMINAL LAW—MANSLAUGHTER—KILLING HUSBAND BY PARAMOUR OF WIFE—JUSTIFIABLE SELF-DEFENSE.—Where the defendant was convicted of manslaughter for killing a man who was the husband of a woman with whom he was consorting at the time of the homicide, and the evidence was very strong that the killing was in justifiable self-defense, and might have warranted a verdict of not guilty, any radical invasion of the defendant's rights on the trial must be held to have operated necessarily to deprive him of a fair determination regarding his guilt or innocence.

ID.—IGNORANCE OF DEFENDANT OF MARITAL RELATION BETWEEN DECEASED AND HIS CONSORT.—On the trial for such offense, after the

prosecution had established the fact that the deceased and the woman with whom the defendant was consorting were husband and wife, the defendant was entitled to the widest latitude in showing circumstances tending to support his assertion that, at the time of the homicide, when the deceased was seeking to attack him, he was entirely ignorant of the fact that the deceased was the husband of the woman.

ID.—EVIDENCE TENDING TO SHOW DEFENDANT'S IGNORANCE THAT WOMAN WAS MARRIED.—In that connection, it was material error to refuse to permit the woman to testify whether, *as far as she knew herself,* the defendant, prior to the killing, knew or had any reason to suspect, she was a married woman. Such error was not cured by the subsequent testimony of the woman, to the effect that she first told the defendant that she was married to the deceased immediately after his death.

ID.—WOMAN GENERALLY KNOWN BY DIFFERENT NAME FROM THAT OF HUSBAND.—The defendant should also have been allowed the widest scope in proving that the woman was generally known to the people of the place where she resided and where the homicide occurred, and particularly to himself, by another name than that of her husband; and it was error to exclude evidence to the effect that she always used such other name in communicating with the defendant by telephone, and was invariably called by such name at her place of employment.

ID.—DIAGRAM OF PLACE OF HOMICIDE.—On such trial, it was proper to permit the county surveyor to introduce and explain a diagram of the premises where the killing occurred.

ID.—ERRONEOUS EXCLUSION OF EVIDENCE ON DIRECT EXAMINATION—FACTS BROUGHT OUT ON CROSS-EXAMINATION.—The defendant cannot complain of the exclusion of a question asked a witness on direct examination, if the subject matter of the question was fully brought out on cross-examination.

ID.—IMPEACHMENT OF WITNESS—FAILURE TO MOVE TO STRIKE OUT ANSWER.—The defendant cannot avail himself of error in the admission in evidence of a conversation of a witness for the purposes of impeachment, on the ground that the impeaching question was not in proper form and a part of the answer was a conclusion, if he made no motion to strike the answer out.

ID.—INSTRUCTION—DUTY OF JURY TO ENDEAVOR TO REACH VERDICT.—In such prosecution, it was proper for the court, in the course of its charge to the jury, to instruct them "that the defendant in this action is entitled to the independent judgment of every juror selected to try him; and after listening to all the evidence in this case and the instructions of the court and upon retiring to the jury room for deliberation any juror entertaining a reasonable doubt as to the defendant's guilt of any offense included in the information who should nevertheless for the sake of his own con-

venience or the convenience of any other juror, or for any other reason while entertaining such reasonable doubt, vote for the conviction of defendant of murder in the first degree, murder in the second degree, or even manslaughter, would be perpetrating upon the defendant a grievous wrong and violating his own oath as juror."

ID.—ERRONEOUS INSTRUCTION AS TO DUTY OF JURY.—Notwithstanding such instruction, it was prejudicial error for the court, in the concluding part of its charge, to tell the jury, in effect, that they were oath-bound to reach some sort of a verdict, that to vote time after time in accordance with the first ballot cast was most reprehensible, and that the failure to try to reach a verdict would render the offending jurors guilty of a flagrant violation of their oath.

ID.—HUSBAND KILLED IN ENDEAVORING TO FORCE ENTRANCE TO WIFE'S BEDROOM—ERRONEOUS INSTRUCTION AS TO RIGHT OF MARITAL ACCESS.—At the time of the homicide, the defendant was in the bedroom of the woman with whom he had been consorting, and the deceased, with great force, was endeavoring to break down the door of the room, for the purpose of taking vengeance on the defendant. The woman was not then in the room, having left it, to the knowledge of the deceased, a short time before. The evidence showed that the woman and the deceased had not been living together as wife and husband for several months prior to the homicide. *Held,* that an instruction was erroneous which in effect gave the jury the idea that the deceased, as the husband of the woman, was acting under some peculiar marital privilege of access to the room which the defendant was bound to respect, unless he was sure that the deceased meditated great violence.

ID.—RIGHT OF SELF-DEFENSE OF PARAMOUR.—While the defendant's conduct with the woman was immoral, it did not take away from him the natural right of self-defense, and the very fact that the jury would probably look with reprehension upon his gross impropriety made it all the more necessary that he should be tried upon the actual issues involved, and that his rights should not be jeopardized by prejudice.

APPEAL from a judgment of the Superior Court of Yuba County and from an order refusing a new trial. Eugene P. McDaniel, Judge.

The facts are stated in the opinion of the court.

W. H. Carlin, and Waldo S. Johnson, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

MELVIN, J.—A rehearing was granted after decision of this case by the district court of appeal. We quote from the opinion of that court the statement of facts:

"Bury and his wife were married at Sebastopol in Sonoma County on the sixteenth day of August, 1910. She remained there until the latter part of the month when she returned to the home of her parents in Marysville. After the expiration of a month she returned to her husband but remained only till the middle of November. She then came back to Marysville and went to work as a waitress at the Western Hotel where she was engaged until the tragedy on the night of February 9, 1911. Bury and his wife did not live together after they parted in November. He came to Marysville twice, however, after that. One of these occasions was about the first of December, when he stayed over Sunday and exhibited a pistol to Mrs. Bury's father and threatened to kill the defendant. The second visit was on the ninth of February, the morning before the homicide, when he met his wife at the hotel and, exhibiting his pistol, he again threatened to kill the defendant. She left a note at the table used by defendant, who was boarding at the hotel, warning him of his danger. At the noon hour the defendant obtained the note and he went and purchased a pistol. He also procured a bolt for the door of the room occupied by Mrs. Bury, as she had requested of him some days before. That evening, after work, he went to her room in the annex of the hotel, placed the bolt on the door and he and the woman retired together. The deceased came to Marysville that night from Sacramento, arriving between one and two o'clock. He inquired for the location of Mrs. Bury's room of the porter and the latter accompanied him to the place. After telling the porter to go away he knocked on her door. The woman heard him first and informed the defendant that the man was Bury. Both got out of bed and began to dress. Mrs. Bury opened the door and went out into the hall and talked with Bury, trying to induce him to go away. As she went out of the door into the hall she called to the defendant not to let Bury in or he would kill him. While struggling with Bury near the head of the stairs leading from the building to the street, Mrs. Bury saw her father, who was a police officer, pass down the street and she called to him but he did not hear. Mr. Bury broke away from her and

returned to the door. She ran down the stairs and at the
foot called her father who turned and ran back, and as he
was about half way up the stairs, his daughter in advance of
him, two shots were fired. When the officer arrived at the
door the woman had already entered and Bury was reeling
and he was caught by the officer and died shortly afterward,
having been shot through the heart. After Mrs. Bury ran
down stairs Mr. Bury sought to force the door, breaking the
lock but not the bolt, but straining the casement through
which the lock and bolt were fastened, away from the post a
quarter of an inch. The door itself was cracked. While the
deceased was trying to break open the door, the defendant,
who had heard Mrs. Bury run down stairs calling her father,
endeavored to hold the said door and did so for some time.
Finally there came a crash and something struck defendant
which was probably the 'ketch' broken off the door and he
believed that he had been shot and that the door was coming
in, and, believing that his life was in danger, he fired one
shot directly through the door and then he swung around
and a second shot was fired involuntarily, the bullet going
diagonally through the door and penetrating the wall beyond.
The first shot was the one that struck deceased while he was
in a crouching position with his left shoulder against the
door. The defendant had never met the deceased personally
and he had no knowledge that the woman was married to
Bury until after the shooting, when she returned to the room
and said to defendant, 'I married that man.' Defendant had
been working in Marysville as head draughtsman for the Yuba
Construction Company for about two years and was a man
of excellent character, as testified to by many witnesses.''

From the foregoing statement the district court of appeal
concluded that a verdict of not guilty might well have been
rendered on the ground of self-defense, but because Mrs. Bury
immediately after the shooting asserted to those in authority
that she had shot her husband; because she at first failed to
testify about the warning which she later said she gave to the
defendant after she went out to meet Bury in the hall; be-
cause at the trial she said that Bury had a pistol in his hand
on the night of his death, while at the preliminary examina-
tion she had testified that he had no weapon at the time of
the tragedy; and by reason of the fact that many of the lead-

ing circumstances of the killing were related only by the defendant and by Mrs. Bury who was obviously friendly to him, the jury might have been justified in disregarding some of the testimony upon which the theory of self-defense was based. Conceding all this to be true, nevertheless the evidence tending to support that theory was so very strong that any radical invasion of the defendant's rights must have operated necessarily to deprive him of a fair determination regarding his guilt or innocence. Upon a careful review of the evidence we have found such departure from the rules of law in criminal cases as impels us, under all the circumstances, to a conclusion that the judgment must be reversed and a new trial must be ordered.

Defendant's counsel insist with much force that Watson was convicted, not because he killed Bury, but because at the time of the shooting he was in a room which he and Bury's wife had been occupying.

The district attorney was permitted, over the objection of defendant's counsel, to introduce the record of the marriage of Bury and Edith Schmidt. The woman had been married to and divorced from a man named Schmidt, and it was shown by abundant evidence that after her brief residence with Bury as his wife she was known in Marysville, following her return, as Edith Schmidt. Defendant's counsel assigns as error the introduction of the record of the marriage of the woman to Bury, especially in view of the fact that the prosecution made no effort to show that Watson knew of the relationship of the woman called Edith Schmidt to Bury. Naturally the proof of the marriage would tend to prejudice the defendant in the eyes of the jury and would throw upon him the burden of showing, if he might, that he was not consciously committing adultery. He cannot complain, however, of the mere introduction of this evidence because the woman, when she was called as a witness for the defense, testified that her name was "Mrs. John Bury" and that deceased was her husband. But this evidence of the marriage having been introduced, the defendant was entitled to the widest latitude in showing circumstances tending to support his assertion that he was acting in utter ignorance of the fact that the man seeking to attack him was the husband of the woman with whom he had been consorting. The court sustained an objection to the question

propounded to Mrs. Bury: "From the time of your return, this time, going back about a month and a half after your marriage, up to the night of the shooting, did you and Mr. Bury live together at all?" An answer to this question should have been allowed by the court, but perhaps the error was cured by a later question: "Did you and Mr. Bury live together as husband and wife at Marysville at all?" and the answer "No, sir." But material error was committed by the court in sustaining an objection to the following question: "I will put it this way, Mrs. Bury. *As far as you know yourself,* up to and including the night of the shooting and until after the shots were fired, did Mr. Watson know or had he any reason to suspect that you were a married woman or had ever been married, after being divorced from Herman Schmidt?" The objection to this question was that it was incompetent, irrelevant, immaterial, and leading. The objection should have been overruled. Any legal evidence tending to show the defendant's ignorance of the marriage was proper. The woman should have been permitted to state whether she or any one in her presence had ever told defendant of her marriage to Bury or whether the defendant himself had ever intimated to her anything indicating such knowledge. Nor was the error cured by her subsequent statement in which she told how she had exclaimed to Watson, immediately after the death of Bury, "I was married to that man," that being, as she explained, the first time she had imparted to the defendant the fact of her marriage. This explanation of course did not include the elements which would have comprised an answer to the question to which an objection was sustained. It did not deny, as a negative answer to the original question would have done, that defendant might have possessed, to her knowledge, information regarding the marriage from other sources.

The defendant should have been allowed the widest scope in his proof that Mrs. Bury was known to the people of Marysville and particularly to him as "Edith Schmidt." While both she and the defendant testified that he knew her by the name which was hers after her first marriage, he was entitled to proof of the common report regarding her *status.* Such testimony would not be hearsay, as the lower court seemed to think it would. If she had been generally known as "Mrs.

Bury," Watson would have been charged with knowledge of that fact, not because he would have been presumed to know of the marriage certificate which was of record in another county, but because of the common report that she was a married woman. Married people are, as a rule, known as such by general repute in the communities in which they reside; therefore the evidence of the woman's marriage to Bury having been admitted, the jurors would naturally suppose that she was regarded as a wife by the people of Marysville who knew her. To repel this supposition the defendant was entitled to prove, if such were the fact, not only that Bury did not live with and support his wife, but that she did not bear his name. Defendant roomed at the home of Mrs. Garrett. He offered to show by her that the woman frequently called up the defendant by telephone, always using the name "Edith Schmidt." He also offered to show by the manager of the dining room in which she worked that she was invariably called "Edith Schmidt." This evidence was erroneously excluded, for if admitted it would have had a direct tendency to support his declaration that he always knew her as "Edith Schmidt."

Appellant complains because Mrs. Bury was not allowed, on direct examination, to state why she desired to have a lock put upon her door. On cross-examination, however, she fully declared her reasons. He cannot, therefore, justly object to the court's ruling in this behalf.

It was proper for the county surveyor to introduce and explain a diagram of the premises where the killing occurred. (*People* v. *Loper,* 159 Cal. 21, [Ann. Cas. 1912B, 1193, 112 Pac. 720].)

Officer McCoy was asked to relate and did detail, over defendant's objection, a conversation between himself, Edith Schmidt and the district attorney, in which the woman said that she wrestled with Bury outside the door for five or ten minutes, giving Watson ample time to escape if he had wished to do so. The impeaching question was not in proper form and the latter part of the answer was a conclusion. The first error was harmless because the foundation had been amply laid by a question to Mrs. Bury regarding the time during which the wrestling outside the door had lasted, according to her statement to McCoy. Neither error is of any avail to

defendant because no motion was made to strike the answer out.

Testimony was given by Miss Rena Ryant regarding a threat made by Bury against Watson in the year 1910. In describing the excited condition of Bury she said "He didn't seem like a human being in that frenzy—he was in such a frenzy." In denying a motion to strike out this answer as being the mere opinion of the witness, the court remarked: "I think she has stated perhaps too graphically her impression." Witness protested that what she had stated was "absolute truth," and the court replied: "I mean your language is very strong— your conclusion, but I have no doubt of your being truthful." While the first comment of the court, standing alone, might have been misleading and might have caused the jury to believe that the court considered Miss Ryant's testimony an exaggeration, we think this tendency was checked by the court's prompt disclaimer of any intention to impugn her veracity.

A number of alleged errors are predicated upon instructions given and refused, but it will not be necessary to notice any save the ones that follow. In the course of the charge the court used this language:

"I further instruct you that the defendant in this action is entitled to the independent judgment of every juror selected to try him; and after listening to all the evidence in this case and the instructions of the court and upon retiring to the jury room for deliberation any juror entertaining a reasonable doubt as to the defendant's guilt of any offense included in the information who should nevertheless for the sake of his own convenience or the convenience of any other juror, or for any other reason while entertaining such reasonable doubt, vote for the conviction of defendant of murder in the first degree, murder in the second degree, or even manslaughter, would be perpetrating upon the defendant a grievous wrong and violating his own oath as juror."

This instruction was substantially correct, although in view of a later instruction the word "even" qualifying "manslaughter" might well have conveyed a suggestion to the jurors that there would be something less of moral turpitude in convicting an innocent man of manslaughter than of a higher degree of homicide. However, the instruction was in line

with the admonition·to the jury approved in *People* v. *Dole,* 122 Cal. 495, [55 Pac. 581] ; *People* v. *Howard,* 143 Cal. 324, [78 Pac. 1116], and *People* v. *Wong Loung,* 159 Cal. 535, [114 Pac. 829]. But later, and indeed as the last declaration of the law applicable to this particular case (except the purely formal matters of selection of a foreman, the styles of verdict and the like) and consequently occupying a place of peculiar emphasis, this instruction was delivered:

"Gentlemen of the Jury: This case is now submitted to you for your consideration and decision. You and each of you solemnly swore that you would decide it in accordance with the testimony of the witnesses, and the instructions of the court. To comply with your oath, it will require of you calm deliberation, and careful consideration. A jury is seldom of the same mind on the first ballot, but for that reason the jurors should not sit back and refuse to compare notes with their fellow jurors, but work all the more earnestly to arrive at a verdict and thus comply with their oaths. To vote time after time in accordance with the first vote cast, and not try to arrive at a verdict is to deliberately set aside the oath you took on being accepted as jurors, to wit: That you would return a verdict in accordance with the testimony delivered in the case. This, each one of you can do and do no violence to your conscience as fair-minded, conscientious and intelligent jurymen."

By the foregoing instruction the jurors were told, in effect, that they were oath-bound to reach some sort of a verdict— that to vote time after time in accordance with the first ballot cast was something most reprehensible—indeed that failure to try to reach a verdict would render the offending jurors guilty of a flagrant violation of their oaths. While a juror is bound to consider the evidence carefully and to pay respectful attention to the opinions of his associates, the very thing he is *not* required to do is to endeavor at all hazards to agree with them. We are mindful of the rule that instructions are to be read together, and that all of the law on one subject may seldom be stated in a single instruction, but although during the delivery of the charge the jurors had been properly admonished regarding the individual duty of each of them to maintain his conscientious opinion, we do not think that admonition neutralized the error of the later instruction.

After most solemnly reminding them of their sworn duty, the court informed the jurors that ''a jury is seldom of the same mind on the first ballot,'' and that therefore arose the duties of consultation with fellow jurors and agreement on a verdict. It may or may not be true that a verdict is seldom determined by the first vote taken in the jury room. Whether it be true or not, the statement of that supposed fact has no proper place in an instruction as a reason why jurors should consult and ''compare notes with their fellow jurors.'' The purpose of consultation is to reach, if possible, a true and conscientious determination. Jurors are not called upon to compare notes merely because other jurors have agreed after an initial diversity of opinion. Such an instruction, particularly in this case wherein the evidence which is admittedly true (to say nothing of the testimony open to possible doubt) gives very strong support to the theory of self-defense, must have operated to defendant's great disadvantage. Jurors retiring to deliberate, with the court's most emphatic and practically final declaration in their minds, might reach a verdict of manslaughter (thinking that thus they would avoid the deliberate setting aside of their oath) notwithstanding the firm belief on the part of some of them that the defendant acted as a reasonable man in self-defense.

The proof showed that Bury and his wife had not been living together for months, and that she was employed as a waitress in the hotel. The uncontradicted testimony of the defendant, of Mrs. Bury and of her father was that when the shots were fired the woman was not in her apartment at all. Yet the court gave the following instruction:

''I further instruct you, gentlemen of the jury, that the Civil Code of this state declares that 'Neither husband nor wife has any interest in the property of the other, but neither can be excluded from the other's dwelling.' If you find from the evidence beyond a reasonable doubt that on the night of the homicide the deceased, John F. Bury, and the witness Edith Bury were, then and there, husband and wife, then as matter of law the husband had the right to seek and demand entrance into and to enter said room if it was shown to your satisfaction that said room was then and there the dwelling room of said Edith Bury; and I further instruct you that no person had a right to exclude said husband from said dwell-

ing unless you find from the evidence that he, the said husband, was then and there seeking to enter said dwelling room with and for the purpose of killing, or doing great bodily injury to, such or any person therein or committing therein any felony.''

This was followed by instructions that, notwithstanding the marriage relation and the right of a husband to access to his wife's dwelling, he may not seek to enter her abode by force for the purpose of killing or doing great bodily injury to any person who may be therein with his wife's consent. These instructions, particularly the one which we have quoted *verbatim*, should not have been given. Their only effect must have been to give the jury the idea that Bury was acting under some peculiar privilege of access to that room which Watson was bound to respect, unless he was sure that ·the former meditated great violence. Under the evidence there could be no essential difference between these men and any other two individuals, one of whom was trying to break in a door to ·reach the other. Bury was not seeking his wife's society. He had seen her run down the stairway and had heard her calls for help. There was no claim nor any evidence that Bury's errand was one other than of vengeance. He resided in another city and not with the woman who, although his wife, was living under the name she bore prior to their marriage. The question of reasonable access to a spouse's dwelling was not involved, and the natural result of the instructions upon that subject would be to convince the jurors that the defendant was a trespasser, and as such he had a very limited right to defend himself, but must flee if such a course were at all possible. The giving of these instructions was error. The defendant offered an instruction which might have cured the error produced by the other instructions upon access by a husband to a wife's dwelling.· This instruction, however, was refused.· It was in the following language:

''I instruct you that while the Civil Code of this state provides that the husband cannot be excluded from the wife's dwelling, yet he has no right to enter her dwelling with force and against her will.''

While defendant's conduct with the woman was immoral, it did not take away from him the natural right of self-defense,

and the very fact that the jury would probably look with reprehension upon his gross impropriety made it all the more necessary that he should be tried upon the actual issues involved—that his rights should not be jeopardized by prejudice.

The judgment and order are reversed.

Henshaw, J., Lorigan, J., and Shaw, J., concurred.