[Crim. No. 978.   First Appellate District, Division Two.—November 2, 1921.]

## THE PEOPLE, Respondent, v. VIRGINIA P. CLARK, Appellant.

[1] CRIMINAL LAW—MURDER—INVOLUNTARY CONFESSION.—Where one arrested for murder is denied the benefit of counsel and is repeatedly assured by the police officers and matrons that they are her friends and will do nothing to harm her, and is brought to a weak physical and mental condition by long-sustained examination without food or other nourishment, the statement by one of those in authority that it was the best thing for her to tell the truth could not help but give her the impression that by telling the truth regarding the homicide those who professed to be her friends would aid her in getting lighter punishment, and a confession made under such circumstances and upon such a statement is involuntary and inadmissible.

[2] ID.—DENIALS OF KILLING—EVASIVE EXPLANATIONS—ADMISSIONS.— Evidence of statements of the defendant denying the killing and of evasive explanations made by her as to the manner of death are admissible without a showing of their voluntary character, since they are merely admissions and not confessions.

[3] ID.—LIFE HISTORY OF DEFENDANT—PROOF OF DEPRAVITY—PREJUDICIAL ERROR.—In a prosecution for murder, where a physician in testifying that the defendant was insane stated that in reaching such conclusion he had taken into consideration the life history of the defendant, which had been written by her while in jail and which had been delivered by her to one of her counsel as a confidential communication, it was prejudicial error to permit the introduction of such life history in evidence, after its production had been ordered on the request of the district attorney, where such demand was made on the theory that the document was necessary to enable the prosecution to examine the witness and the offer in evidence was made, not for the purpose of contradicting the witness, but manifestly for the purpose of degrading the defendant and of exhibiting her to the jury as a low, depraved, and immoral person.

[4] ID.—MURDER OF HUSBAND—CORRESPONDENCE BETWEEN DEFENDANT AND OTHER MEN.—In a prosecution of a wife for the murder of her husband, correspondence between the defendant and other men which tends to prove motive for the crime is admissible, but not such correspondence as merely shows that the defendant is a person of loose moral character.

---

1.   When confessions are admissible, note, 46 **Am. Rep.** 253.

APPEAL from a judgment of the Superior Court of Alameda County and from an order denying a new trial. James G. Quinn, Judge. Reversed.

The facts are stated in the opinion of the court.

C. A. A. McGee for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, Ezra W. Decoto, District Attorney, John U. Calkins, Jr., Assistant District Attorney, and Frank M. Shay, Deputy District Attorney, for Respondent.

NOURSE, J.—Defendant was convicted of murder in the second degree and appeals from the judgment and from the order denying her motion for a new trial.

The defendant and deceased had intermarried on the 25th of March, 1920, through the aid of a matrimonial correspondence bureau. They lived together in apparent harmony until August 14, 1920, when they went with friends to a public dance, returning to their home at about 1 A. M. They retired to their bed and at about 5 o'clock of the morning of the 15th several shots were heard by a neighbor, accompanied by the voice of defendant crying, "Daddy, Daddy, what have you done?" The defendant went to the bedroom window and called her neighbor, Mrs. Brown, who immediately came to the apartment. She found defendant telephoning for a physician, and in going to the bedroom found deceased lying upon the bed and close by him, also lying on the bed, was an automatic pistol. The deceased did not recover consciousness and died while being taken to the hospital. Subsequent examination disclosed that he had been shot four times, once in the head, once in the chest, once in the abdomen, and once in the left hand. Defendant stoutly maintained that deceased had himself fired the shots, but on the same day she was placed under arrest and, covering a period of two weeks, subjected to several severe and gruelling examinations by the police, culminating in a signed confession on the 1st of September. The autopsy surgeon testified that from his examination of the nature and location of the wounds he believed that they had not been self-inflicted, but defendant's answers to

questions during these examinations and the signed confession of September 1st are the only evidence offered by the prosecution directly implicating her in the commission of the crime.

Her story of the shooting as given in the statement prepared by the police and signed by her is as follows: "On the evening of August 15, 1920, my husband, Chester J. Clark, and I came home at 1 A. M. and went to bed about 2 A. M. We laid in bed and talked until 3 A. M. . . . We had a long session of sexual intercourse and he remained on top of me so long he wore me out and I gently pushed him off. He resented it and grabbed me and hugged me and bit me on the lip and on the breast and on the side and on the thigh and I got mad and tried to get away from him but I could not as he got uncontrollable." She then stated that her husband attempted to commit the crime now denounced by section 288a of the Penal Code (as added by Stats. 1915, p. 1022); that she resisted and finally called him a name which caused him to desist. Her statement follows: "I don't think I said another word but reached under his pillow and got the gun and I was on top of him and began to shoot. . . . He or I did not sleep that night at all. . . . I want to say, and it is God's truth, that I had no intention of harming my husband when we went to bed on the morning of August 15, 1920, in any manner shape, or form, and I would not have harmed him if he did not do what he did. The thought of killing my husband never entered my mind, but I automatically shot him when I realized the nasty position he was in. . . . The whole thing happened so suddenly it is hard for me to describe it in detail."

Appellant makes several assignments of error and these will be considered in the order assigned.

[1] (1) That the alleged admissions and confessions were improperly admitted because not free and voluntary and because obtained by unlawful and improper methods. The showing made by appellant in support of her objection to the admission of this evidence was that for a period of more than two weeks the appellant was subjected to almost daily cross-examination by from two to four police officers who, by "mental suggestion composed of cajolery, flattery, assurances of goodwill and friendship, interspersed with

brutal browbeating accusations, indirect threats, and misrepresentation of facts," and without advising her of her constitutional rights or permitting her to have the benefit of counsel, were able to dominate and control the mind of appellant when she was in a state of physical and mental helplessness. It is conceded by appellant that no specific promises of reward were made, but it is argued that the frequent assurances of the police matron that "she [the defendant] would feel better if she told the truth" and that "I said that was the best thing for her to do; to tell the truth," bring the case within the rule of *People* v. *Barrie,* 49 Cal. 342, 345, *People* v. *Gonzales,* 136 Cal. 666, 668 [69 Pac. 487], and *People* v. *Thompson,* 84 Cal. 598, 606 [24 Pac. 384]. When a prisoner is told by one in authority that it will be better for him to make a full disclosure or that it will be better to tell the truth, the confession so obtained is not voluntary and is inadmissible. Such assurances are not of the same class as mere exhortations to tell the truth, or the statement to the prisoner that the truth would not hurt him. These statements unaccompanied by words of inducement do not render the confession inadmissible. But where, in a case such as this, a prisoner is denied the benefit of counsel and is repeatedly assured by the police officers and matrons that they are her friends and will do nothing to harm her, and is brought to a weak physical and mental condition by long-sustained examination without food or other nourishment, the statement by one of those in authority that it is the best thing for her to tell the truth could not help but give her the impression that by telling the truth regarding the homicide those who professed to be her friends would aid her in getting a lighter punishment.

In addition to this it is apparent from the testimony of the witnesses for the state that the relentless sweating process to which the appellant was subjected was such as to render her statements involuntary. She was put through a course of cross-examination continuing over a period of two weeks when she was in such a low physical and mental condition that she had to be assisted by matrons into the examination room, with her head covered with wet towels to keep her in a condition to answer the questions. These examinations lasted for hours at a time, during which time appellant was

denied food or other nourishment. It is significant that throughout the hundreds of pages of testimony on this phase of the case there is no word suggesting that at any time she made any voluntary statement regarding the homicide. On the contrary, while a witness on the stand, she testified that the statements to the police were involuntary. She also retracted all admissions of guilt contained in those statements and insisted that she was not responsible for the killing of her husband. The case comes squarely within the rule announced in *People* v. *Loper,* 159 Cal. 6, 17 [Ann. Cas. 1912B, 1193, 112 Pac. 720] ; *People* v. *Borello,* 161 Cal. 367 [37 L. R. A. (N. S.) 434, 119 Pac. 500] ; *People* v. *Quan Gim Gow,* 23 Cal. App. 507, 512 [138 Pac. 918].

[2] In this phase of the case both appellant and respondent treat all the statements of the accused as confessions and as such subject to the same rule. In the early stages of her examination appellant denied the shooting and gave evasive explanations of how her husband met his death. Evidence of statements of that character is admissible without showing they were voluntary because they are merely "admissions" and not "confessions." (*People* v. *Fowler,* 178 Cal. 657, 664 [174 Pac. 892] ; *People* v. *Clifton,* 186 Cal. 143 [198 Pac. 1065] ; *People* v. *Peete,* 54 Cal. App. 333, 202 Pac. 51.) What has been said in regard to appellant's first point is, therefore, to be limited to the evidence of her statements in which she acknowledged her guilt. These having been offered as confessions, the rule clearly applies. (*Bram* v. *United States,* 168 U. S. 532 [42 L. Ed. 568, 18 Sup. Ct. Rep. 183, see, also, Rose's U. S. Notes].)

[3] (2) That the trial court erred in requiring appellant's witness to deliver to the district attorney the written story of appellant's life and in admitting the same in evidence. While appellant was confined in the county jail awaiting trial she wrote a detailed story of her life from early childhood until the time of her arrest and delivered it as a confidential communication to one of her counsel. He in turn handed it to Dr. Ball, who had been summoned by appellant to make a professional examination of her and to testify as to her sanity. When the doctor was called as a witness he testified that appellant was insane and that in reaching such conclusion he had taken into consideration the life history of appellant "beginning with her family history of heredity

which shows an alcoholic and degenerate father and a history of insanity on her mother's side, her uncle and aunt being insane . . . her father's mother having been evidently a degenerate type and her father's brother an alcoholic and degenerate also, and the fact that her brothers and sisters gave evidence of a nervous condition and at least epileptic form convulsion from her description to me, . . . that subsequently in her life she developed a disease called syphilis . . . from her [former] husband." Upon cross-examination the district attorney demanded the production of the written life story and thereafter, over the strenuous objection of appellant, offered it in evidence and read it in full to the jury. The demand was made on the theory that the document was necessary to enable the prosecution to cross-examine the witness and the offer of the document in evidence was made, not for the purpose of contradicting the witness, but manifestly for the purpose of degrading the appellant and of exhibiting her to the jury as a low, depraved, and immoral person.

The introduction of this document cannot be defended upon any legal principle. The only defense attempted by respondent is that appellant herself was responsible for its introduction, but this finds no support in the record. As said in *People* v. *Dye,* 75 Cal. 108, 112 [16 Pac. 537, 540] : "It is contrary to the first principles of justice to try a man for one crime and convict him of that because he may be guilty of another, or because he may be a low specimen of humanity." To the same effect are *People* v. *Arlington,* 123 Cal. 356, 357 [55 Pac. 1003] ; *People* v. *Wallace,* 89 Cal. 158, 162 [26 Pac. 650] ; *People* v. *Mohr,* 157 Cal. 732, 735 [109 Pac. 476] ; *People* v. *Whiteman,* 114 Cal. 338, 343 [46 Pac. 99].

It is hardly necessary to point out that the admission of this life story, depicting as it did a life of depravity and immorality from early childhood, was prejudicial to appellant's case. That it was introduced for that purpose is evidenced by the fact that the district attorney in his address to the jury referred to the facts therein related as evidence that appellant was a low and depraved character and relied upon these facts as proving his theory of the case. To add to the injury, the trial court refused appellant's request to instruct the jury to disregard these statements of the dis-

trict attorney and also refused her requested instruction that this life history should be considered by the jury in so far only as it related to the question of the sanity or insanity of appellant.

[4] (3) That the court erred in permitting the introduction of postal cards and letters written by and addressed to appellant. In this connection it is argued that the correspondence between appellant and various men in the east did not tend to show any motive for the killing but merely tended to place appellant before the jury as a woman of loose moral character. In many respects appellant is correct in this. It would serve no purpose to analyze this voluminous correspondence. Of course, it is the settled rule that a correspondence carried on between one accused and a third party is admissible when it tends to establish defendant's motive in taking the life of deceased. (*People* v. *Le Doux,* 155 Cal. 535, 548 [102 Pac. 517]; *People* v. *Soeder,* 150 Cal. 12, 15 [87 Pac. 1016].) But where the correspondence has no possible bearing on the question of motive but is offered merely to show that the defendant has led an immoral life, the admission of such part of the correspondence is error.

It is also argued that this entire correspondence was inadmissible because it had been seized by the police officers by entering into the premises where appellant resided and taking them without a search-warrant in violation of the constitutional guaranty of the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. (Const. of Cal., art. I, sec. 19; Const. U. S., 4th Amendment.) It is also argued that in producing these private papers in evidence the state violated the guaranty of the fifth amendment to the federal constitution that one accused of crime should not be compelled to be a witness against himself. In support of the argument, *Boyd* v. *United States,* 116 U. S. 616 [29 L. Ed. 746, 6 Sup. Ct. Rep. 524], *Weeks* v. *United States,* 232 U. S. 383 [Ann. Cas. 1915C, 1177, L. R. A. 1915B, 834, 58 L. Ed. 652, 34 Sup. Ct. Rep. 341, see, also, Rose's U. S. Notes], and similar federal authorities are cited. To these might be added the recent decision of *Gouled* v. *United States,* 255 U. S. 298 [65 L. Ed. 647, 41 Sup. Ct. Rep. 261]. In the recent case of *People* v. *Mayen,* 35 Cal. App. Dec. 442, the district court of appeal followed the rule of these cases. But the

supreme court granted a hearing in that case and the matter is now pending before it for decision. For this reason the question should await the determination of the supreme court.

As the case must be reversed for the reasons given, it is unnecessary to discuss the other assignments made.

The judgment and order denying a new trial are reversed and a new trial ordered.

Langdon, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on November 26, 1921, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 29, 1921, and the following opinion then rendered thereon:

THE COURT.—The petition of the respondent for a rehearing in this court after decision by the district court of appeal of the first appellate district, division two, is denied.

We deem it necessary to say in explanation of this order that we do not understand the opinion of the district court to hold that none of the postal cards and letters addressed to and written by the defendant and which were introduced in evidence on the former trial was admissible in evidence. On the contrary, we understand it to mean that no part of the correspondence is admissible in evidence except such letters written by or received by the defendant as may tend to prove that the defendant had some motive for the commission of the crime with which she is charged. The question whether such letters tend to prove motive depends, of course, on the contents thereof.

Shaw, C. J., Shurtleff, J., Waste, J., Sloane, J., Richards, J., pro tem., and Wilbur, J., concurred.

Lennon, J., deeming himself disqualified, did not participate.