[Crim. No. 1087. First Appellate District, Division One.—February 15, 1923.]

THE PEOPLE, Respondent, v. GEORGE GRAFFT et al., Appellants.

[1] CRIMINAL LAW — CONFESSION — CHARACTER OF — APPEAL.—The question whether a confession is free and voluntary or the result of inducement, coercion, intimidation, or duress exerted by the officer is one peculiarly within the province of the trial judge to decide upon the facts, and where his conclusion has substantial support in the evidence, it will not be interfered with on appeal.

[2] ID.—MURDER—CONSPIRACY TO COMMIT ROBBERY—SUFFICIENCY OF EVIDENCE.—In this prosecution of two defendants jointly for the crime of murder, the evidence shows that death resulted from the conspiracy to commit robbery.

APPEAL from a judgment of the Superior Court of Fresno County and from an order denying a new trial. J. E. Woolley, Judge. Affirmed.

The facts are stated in the opinion of the court.

---

1. Confession of defendant as admissible against self and co-defendant, notes, 4 Ann. Cas. 918; 18 Ann. Cas. 274.

Frank Curran, C. O. Hansen and H. H. Baker for Appellants.

U. S. Webb, Attorney-General, and John H. Riordan, Deputy Attorney-General, for Respondent.

ST. SURE, J.—Defendants were jointly charged by information with murder, tried together, and convicted of murder in the second degree. Defendant Grafft appeals from the judgment, and defendant Dunn from the judgment and order denying his motion for a new trial. Grafft bases his appeal upon the insufficiency of the evidence and alleged errors of law. Dunn seeks reversal solely upon the ground that his confession, introduced against him, was procured through inducement and intimidation.

Chow Wing Hop, known as Wing Hop, kept a grocery-store at Coalinga, Fresno County. Near the store was a blacksmith-shop and radio station. At the front of the store was a porch, the floor of which cleared the sidewalk by about two feet. On November 10, 1921, between 6 and 6:15 P. M., three young men named, respectively, Mayberry, Bryan, and Davis, in an automobile, stopped at the blacksmith-shop. They noticed another car parked in front of the grocery-store, faced in the same direction as their own. Mayberry alighted and entered the station, while Bryan and Davis remained in the car. A few seconds after, Mayberry heard two screams in close succession. The screams were also heard by Smith, radioman, though he had on a radio headpiece, and were recognized by him as the cries of the Chinese. It was too dark to recognize individuals even at a short distance, except by form or general peculiarity of movement. Both Bryan and Davis testified that while waiting for Mayberry they first heard a noise like that of scuffling in the store, followed by screaming; that four men emerged from the store, the first, somewhat in advance of the others, leaped into the car; the second got in just as the motor started, and two were scuffling together on the porch. Bryan saw one of these two strike the other about the head and shoulders. Davis "heard something hit." One jumped into the car as it got into motion, and the other fell to the sidewalk from the porch. All the men getting into the

car seemed to be in a great hurry. Mayberry came out of the station in time to see but three men, one .getting into the car and two on the porch, the latter holding on to each other, and he saw a blow struck by one knocking the other headlong off the porch. This blow Mayberry both heard and saw. Smith came out only in time to see the Chinese lying on the sidewalk and a man part way into the car. By an arc-light some seventy yards distant he recognized the one fallen to the sidewalk as Wing Hop by his "striped overalls and white shirt."

Mayberry, Bryan, Davis, and Smith gave chase to the fleeing car, attempting to get its number, but they soon lost it and never saw it again. Returning to town they joined the city marshal and went back to Wing Hop's store, where they found the Chinese lying on the sidewalk. In response to questioning on the way to the hospital Wing Hop said, "Nobody hit me; what you want?" but they did not consider him rational, and Dr. Mountfort, who attended him at the hospital, testified that he was dazed and semi-conscious from the time he was received at the hospital (between 6:20 and 6:30 o'clock) until his death shortly after 8 o'clock the same evening. An autopsy showed death was caused by a fractured skull. Dr. Mountfort also testified that the large wound in the back of the head was caused by a blunt instrument.

Between 5:30 and 6 o'clock in the evening of the same day both defendants, in company with a third man, were seen and spoken to by the sheriff with two of his deputies at a restaurant in Coalinga. None of the three was seen again by any of the sheriff's party until Grafft's arrest November 22 and Dunn's December 21, 1921.

On November 22d the sheriff and Grafft had a conversation alone, lasting about three or four hours. On the next day there was another meeting between them in the afternoon, and in the evening of the same day another, at the latter of which there were also present the district attorney, court reporter and Deputy Sheriff Collins. Grafft told his story through answers to questions put by the district attorney. This story was of a plan to rob Wing Hop, with the attempt resulting in his death. Though Grafft had been with Green (the third man not apprehended) and Dunn for a ride in a stolen machine, and had heard them

discuss robbing the Chinese, he asserts that he took no part in the plans; that he did not believe the others would try it, and that, though actually staying with the others on the trip to Wing Hop's store, refused to get out on Green's orders on arrival there, but remained seated in the car during all the occurrences which followed. Dunn's attorney objected to the introduction of Grafft's confession, and put him on the stand in an endeavor to show that the confession was procured by inducements. He testified that he had been in solitary confinement three days; that the sheriff had told him the first day, "You better confess because we have the goods on you and will convict you anyway. No man ever hung in this state that ever confessed." On the second day the sheriff talked to him, he says, "about my mother more than anything else," with reiterations of what he had said the day before. At the meeting at which the statement was made the sheriff told him, "Just remember what I told you yesterday." All of this the sheriff denies, admitting that he told the defendant that "the truth should not hurt anyone," and that he talked to defendant about the case and urged him to tell the truth of what he knew about it.

Dunn was arrested December 21st. An hour's conversation was had between the sheriff and Dunn the same evening, and another the next day of equal length, after which Dunn also made a statement, there being present the sheriff, Deputies Sheriff King and Collins, a Coalinga constable named Peterson, and the district attorney. Dunn's statement tallied generally with that of Grafft except as to the latter's nonparticipation, and also with the testimony of the eye-witnesses. Briefly, the offenders had stolen a car and taken a trip to the coast and back to Coalinga. Being short of money they planned to rob the Chinese, noting his place when coming into town. They later encountered the sheriff and his deputies at the restaurant. Leaving there they drove to Wing Hop's grocery, which they found closed. A dim light showed in a back room, and on calling him, the Chinese came out and opened the store. They entered, asking for supplies, and while the Chinese was bent over Dunn hit him on the head with an eight-inch Crescent wrench which he had carried from the car in his sleeve. The Chinese showed fight,

and Dunn hit him again. By this time Wing Hop was screaming and trying to hold any of his assailants he could grasp. Dunn freed himself, and running out jumped into the car and started the motor. Green and the Chinese grappled on the porch and Green finally threw the Chinese off and leaped into the moving car. The same objections to the introduction of this confession were made by Dunn's attorney, and the sheriff and defendant put on the stand for the purpose of showing how the confession was obtained. The sheriff again testified that there were no threats, inducements, or promises. The defendant testified that he was told by the sheriff that he would be "railroaded"; "that no man in the state of California ever hung that made a confession," and that "if I made a confession that there was a very slim chance of my hanging, and that I had better confess." Dunn also testified that he was not 'permitted to have an attorney at the time he asked for one, and that the district attorney made the same statements regarding confessions as the sheriff, and that he would not have made a disclosure of the facts had it not been for such statements on the part of the district attorney and sheriff. The court admitted the confession.

Defendant Dunn bases his appeal on the answer to one question, namely: "Did the trial court err in admitting the confession of the defendant James Dunn?"

Counsel for defendant Dunn call our attention to the cases of *People* v. *Loper,* 159 Cal. 6 [Ann. Cas. 1912B, 1193, 112 Pac. 720], and *People* v. *Clark,* 55 Cal. App. 42 [203 Pac. 781]. The facts and circumstances in the instant case are wholly dissimilar to those in the cases cited. The Clark case (citing *People* v. *Loper*) presents an extreme example of what is termed a "relentless sweating process." In the Clark case, Mr. Justice Nourse, writing the opinion for the court, says: "It is apparent from the testimony of the witnesses for the state that the relentless sweating process to which the appellant was subjected was such as to render her statements involuntary." In that case the complaining appellant was put through a course of cross-examination continuing over a period of two weeks when she was in such a low physical and mental condition that she had to be assisted by matrons into the examination room with her head covered with wet towels to keep her

in a condition to answer questions. No such facts or circumstances relating to the confession of Dunn obtain in the instant case. The sheriff denied making the statements attributed to him. And even if there had been admonition, advice, exhortation, or adjuration by the officer to the defendant, the confession would not have been rendered inadmissible. (*People* v. *O'Brien,* 53 Cal. App. 754 [200 Pac. 766]; *People* v. *Haney,* 46 Cal. App. 317 [189 Pac. 338]; 16 Cor. Jur., p. 720, sec. 1474; 16 Cor. Jur., p. 721, sec. 1476.)

[1] The question whether the confession was "free and voluntary" or the result of inducement, coercion, intimidation, or duress exerted by the officer was one peculiarly within the province of the trial judge to decide upon the facts. His conclusion thereon has substantial support in the evidence, and we are of the opinion that we should not interfere with it.

[2] Counsel for defendant Grafft makes specious deductions from the evidence to the effect that the real cause of death was the fall from the porch to the ground; that the conspiracy to rob had been abandoned, and that therefore death was not the natural consequence thereof; that decedent contributed to his own death by clinging to Green and that Grafft had no part in aiding or abetting the killing. Based on these deductions he argues that the defendants were not liable as conspirators, but if at all, individually, and that the death was accidental or caused by Green's act alone. He alleges as errors of law refusal of the court to give instructions favoring such theory.

The errors of law complained of by defendant Grafft are based on the fallacious premise that there was a sufficient intervening break in the continuity of the plan to rob, followed by flight, to admit of the theory of abandonment of conspiracy, and that death resulted otherwise than as a natural and probable consequence of the common enterprise to commit robbery. The entire record points to but one cause of death: acts the natural and probable result of forces set in motion by a common plan and attempt to commit robbery. (*People* v. *Vasquez,* 49 Cal. 560; *People* v. *Lawrence,* 143 Cal. 148 [68 L. R. A. 193, 76 Pac. 893]; *People* v. *Friedman,* 205 N. Y. 161 [45 L. R. A. (N. S.) 55, 98 N. E. 471].)

It is also urged on behalf of defendant Grafft that the statute making a killing in the perpetration or attempt to perpetrate robbery, murder in the first degree, must be strictly construed, and that the verdict of the jury of murder in the second degree was outside its province and an acquittal of statutory murder, and further, in this connection, that the court's instructions to the jury with reference to other verdicts which it might bring in were prejudicial, inharmonious, inconsistent, and tended to confusion.

This assignment is unique in that it really is an objection by defendant Grafft that he was convicted of murder in the second instead of the first degree, for, from the evidence adduced at the trial, the jury might very properly have found defendant Grafft guilty of murder in the first degree. The error of which he complains redounded to his advantage rather than to his prejudice. (*People* v. *Tugwell,* 32 Cal. App. 520 [163 Pac. 508].)

The judgment and order as to the defendant Dunn, and the judgment as to defendant Grafft, are affirmed.

Tyler, P. J., and Richards, J., concurred.