[Crim. No. 7874.   Second Dist., Div. Three.   May 31, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. CECIL THOMAS, Defendant and Appellant.

Ellery E. Cuff, Public Defender, and James L. McCormick, Deputy Public Defender, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George W. Kell, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—By separate informations Cecil Thomas and Trilbey Dan Hopkins were accused of the crime of robbery. The cases were consolidated for trial because they related to the same occurrence. Both defendants were found to be guilty of robbery in the second degree in a trial by jury. Thomas has appealed from the judgment and from the order denying his motion for a new trial.

Because of the nature of the appellant's claim of error hereinafter discussed, it is necessary to set forth at some length the testimony given at the trial. The offense occurred at a café on South Main street in Los Angeles. Ralph Paytiamo, who was in the Navy, entered the café at about 9:30 p.m. on the evening of February 4, 1961. He sat in a booth for a period of time and then went into the restroom. After he was in that room about a minute, he heard the word "hey" and turned around. Someone hit him on his left eye. He went against the wall and fell to the floor. He was hit again and became unconscious. Thereafter he got to his feet. No one else was then present. His wallet containing $20 was missing. He could not identify the person who hit him. Later, when he went to the bus depot, police officers took him to the hospital. Part of his testimony on cross-examination was as follows: "Q. Now, you noticed some other person or persons there after you went down, is that right? A. Yes, sir. Q. In other words, when you were first hit, all you

noticed was the one person that hit you? A. Yes. Q. After you went down, you noticed there was possibly somebody else in there, is that right? A. Yes, because he said, 'Hit him.' He was ordering him to hit me because I had my hands covering my face for the injury that I had. Q. When you went down after you were hit, were you sort of semi-conscious? A. Yes, sir. Q. Do you know whether the person who was there after you were hit said, 'Don't hit him' or 'Hit him' or are you sure? A. He said, 'Hit him.' Q. What else did he say? A. That is all. Q. That is all you heard? A. Yes, sir. Q. Were you hit before or after this was said or do you know? You said you were hit twice? A. Yes, sir. Q. Once when you were standing up? A. Yes. Q. And once when you went down or before you went down? A. Before I went down. Q. In other words, you were standing up—— A. Yes. Q. ——when you were hit both times? A. Yes; when I was going down he hit me. Q. After you got down, then you heard somebody else say, 'Hit him'? A. Yes, because I was turning around. Q. All right. But after you were down, you weren't hit any more, is that right? A. No, sir. Q. In other words, after you heard the other person say, 'Hit him,' you were not hit any more, is that right? A. No, sir.'' On further cross-examination, he testified that when he turned around just before he was hit, he saw two or three other persons in the room but he did not recognize them.

Alyce Leon, a waitress at the café, testified that she saw Ralph Paytiamo go into the restroom shortly after he came into the café. Before that, she saw both Thomas and Hopkins on the premises. After Paytiamo went into the restroom, Hopkins also went into that room. Shortly thereafter Thomas followed. She heard a noise as though someone had fallen in the restroom or in the hallway. Thereafter she heard a second noise. When she changed her position to be able to observe the hallway leading to the restroom, she met Thomas as he was coming out of the hall way. She asked him, ''What happened? Was there a fight back there?'' He replied, ''There is nothing to worry about.'' Thomas went over to the booth where he had been earlier and stood there. Several minutes later Hopkins came out. He looked toward Thomas and, with his head, ''made a come-on signal . . . like he had told him to come on.'' Then Thomas and Hopkins walked toward the front of the building, but the witness did not actually see them go out the door since her view was obstructed by a large juke box. Thereafter Paytiamo came out of the

restroom. The witness' description of him was that he appeared to be "bleeding quite badly . . . from all over his face, his mouth, his nose and his eye" and that he "looked just about out on his feet." On cross-examination, the witness said that in the area of the restroom there was a rear entrance to the café. She further testified as follows: "Q. . . . Now, from where you were standing at the time that you saw Thomas go where you told us was to the restroom, could you see whether or not he was going to the restroom or down the hallway that goes to the rear? . . . A. No, sir. From where I was standing I couldn't tell."

Jean Le Flore was called as a witness for the appellant Thomas. On the evening of the occurrence in question she was in the café. She saw Hopkins and Thomas talk together. Thereafter, about 9:30 or 10 p. m. that night she saw Hopkins and the appellant Thomas at another bar on Pico Boulevard. With respect to the extent of their association there, she testified as follows: "Q. Did you see them together at all that evening down in the other place? A. I think they were talking together, yes, but I didn't see them together, you know, during the whole evening."

The appellant Thomas testified in his own behalf. He saw Hopkins, whom he had known for three or four years, at the café that evening. He had not seen him, prior to that time, for about six or seven months. Hopkins came up and talked to him. About 9 or 9:30 p. m. he went to the rear of the café to go out the back entrance for the purpose of seeing if Jean Le Flore and several other persons were going elsewhere with him. As to what then occurred, he testified as follows: "Q. All right. Did you go all the way or did you come back? A. I went about middleways, right here. Q. Then what did you do? A. I heard a little racket going on in my left side. Q. Was that from the direction of the rest room? A. Yes. Q. Then where did you go? A. I turned around there and walked right here (indicating). I met one gentlemen coming out here (indicating). I don't know him, but he was coming out of the rest room right here (indicating). Q. Did you look to see where he went? A. He was going—I asked—I don't know whether he went this way or that way or that way. Q. Now, did you look into the rest room? A. Yes, I did. Q. When you looked in did you see this Paytiamo there? A. Yes. Q. Where was he? A. Laying on the floor. Q. Did you see somebody else there? A. Yes. Q. Who was that? A. A friend over there, Hopkins. Q. What, if anything, did

you see Hopkins doing? A. He was kicking him in the face. Q. Was he saying anything to Hopkins? A. He was kicking him in the face. Q. Did you say anything to Hopkins at that time? A. Yes, I told him, 'Knock it off. You can kill that man.' Q. What did Hopkins do then? A. He stopped. He was nervous. He was shaking like this. Q. What did you do? A. I left immediately. Q. Where did you go? A. I went out here to my booth drinking a swallow or two of beer I had left in it and I went directly out the front across the street in my car and left. Q. Did you notice Hopkins after you saw him in the rest room? A. No, I didn't turn around and look." He denied that he hit Paytiamo or took his money. On a prior occasion Hopkins had cut Thomas with a knife and the two were not very friendly. When the appellant Thomas went to the rear of the premises he had a glove on his right hand because that hand was swollen. He did not "have to wear it" for his injury but it covered the bandage on his hand "which looked pretty bad."

The defendant Hopkins testified in his own behalf. He denied that he was in the restroom when Paytiamo was there. He did not strike him or take his wallet.

Although James Timmins Dresser, M. D., was called as a witness on behalf of the appellant Thomas prior to the time that Thomas took the witness stand, the résumé of his testimony is given at this place in this opinion because the appellant bases a claim of prejudicial error on the admission in evidence of a portion thereof. Dr. Dresser testified that he saw Thomas on January 20 for an injury to his right hand which was received in the course of his work. The witness' partner saw Thomas on February 3. A portion of the subsequent cross-examination was as follows: "Q. Was there any objective finding in your examination that would indicate that there was a limited use of the hand? A. No significant limitation, no. Q. And then this—— A. Except that his grip was weak in the right hand. Q. In the right hand? Now, when you say his grip was weak, testing the grip depends in some measure on the cooperativeness of the subject, does it not? A. Rather entirely so, yes. Q. So if he does not wish to indicate the full strength of his grip he doesn't necessarily have to do so? A. That would be true. Q. Did you in taking the history and in talking with this man find any indications that there might be a possibility of malingering? A. Not that I recall. Q. May I see the report. A. Yes, you may. Q. Well, in your history you stated—— MR. PIEROVICH [counsel for

defendant Thomas] : Objected to. He is reading from this to refresh the doctor's memory. If he wants to point something out, there is no objection. THE COURT: What is your objection? MR. PIEROVICH: It is objected to as reading from this document which is refreshing the doctor's memory. If he wishes to point out to the doctor from this document, I have no objection to that. THE COURT: The objection is overruled. Q. BY MR. McCORMICK [deputy district attorney] : Did you find that the defendant had been in the Service? A. I don't recall without checking the record. Q. I may point this out: you said he was in the Service in 1952 for 100 days. MR. PIEROVICH: I object to that as hearsay. THE COURT: Overruled. Q. BY MR. McCORMICK: For 100 days and was able to get out on a complaint of asthma which he had never had before or since. He was given a medical discharge. Do you recall him telling you that? A. I don't recall it. Parts of my notes have that. So obviously that was the history he gave me. Q. Is that unusual in asthma? MR. PIEROVICH: Objected to as immaterial. THE COURT: Overruled. Q. BY MR. Mc-CORMICK: Is that unusual in asthma? A. I do orthopedic only. I don't treat medical cases. And to the best of my knowledge it isn't usual. Q. In your report there is an element under 'Discussion' where you have made somewhat of a prognosis. Would you consult that for a minute, please? A. Yes. Q. Now, Doctor, after looking at your report again, was there anything about this man's history that made you indicate your opinion that there might be some malingering or an exaggeration, a subjective exaggeration of his injury? MR. PIEROVICH: I object. That has already been asked and answered. It is incompetent and irrelevant. THE COURT: Overruled. A. BY THE WITNESS: Well, this last paragraph I guess is a summary of it. Would you like that read? Q. BY MR. McCOR-MICK: Well, does this indicate what your opinion was after these examinations and interview? A. I wouldn't have dictated it otherwise, I am sure. Q. All right, indicate what it was. A. (Reading) 'As for a general statement this patient who has spent only 100 days'—— MR. PIEROVICH: It is the same objection. THE COURT: Whatever the objection is, it is overruled. I have already ruled. Q. BY MR. McCORMICK: Begin again, please. A. (Reading) 'As for a general statement this patient who has spent only 100 days in the Service was able to get out on a complaint of asthma which he has never had before or since; does seem to magnify his complaints here today. So I feel he is not too good a candidate

for suggesting any early dramatic type of treatment of any of his complaints.' ''

In calling Dr. Dresser as his witness it was obviously the purpose of the appellant Thomas to show that he had sustained an injury to his right hand several weeks prior to February 4 and thereby to give support to the inference that because of the existence of such handicap it was unlikely that he had participated in the aggressive acts to which Paytiamo had testified. It was, of course, proper on the cross-examination of Dr. Dresser to ascertain his opinion as to whether the appellant was feigning or malingering with respect to the effect of that injury. (See *People* v. *Gorgol,* 122 Cal.App.2d 281, 302 [265 P.2d 69].) But the inquiry in the present case was not limited to the witness' opinion as to such matter based on his examination and the history given by the patient *as to that injury.* The inquiry embraced the subject of asthma—an ailment entirely foreign to the hand injury— and its relationship to the appellant's short military service some eight years before. Moreover, over and above the witness' testimony founded on the contents of the notes made by him as to that subject, in response to questioning by the deputy district attorney the witness said in substance that it was unusual for a person to suffer from asthma only as long as he was in military service. It is reasonable to conclude that thereby there was implanted in the minds of the jurors an impression that the appellant had used a subterfuge to avoid his obligations as to military service.

But aside from the manner, as just noted, in which the prosecution utilized the history of the patient's military service as related by him to the physician, the witness should not have been permitted to use that history as a basis for the expression of an opinion that the appellant was feigning the nature of the recent injury to his hand. The process of reasoning of the physician as exhibited at the trial was not one of arguing directly from act to act but was rather that of inferring from an act of malingering in 1952 that the appellant had a disposition to feign injury to avoid endeavor and, therefore, that he must have been malingering with respect to his hand injury in 1961. (Cf. 1 Wigmore on Evidence (3d ed.) § 192, p. 642.) But the opinion of an expert must have a more reasonable foundation than that evident in the present case if it is not to be a mere arbitrary opinion without substantial value as evidence. (See *Guardianship of Waite,* 14 Cal.2d 727, 731 [97 P.2d 238]; *Thompson* v. *City*

*of Long Beach,* 41 Cal.2d 235, 242 [259 P.2d 649].) Moreover, the allowance of the use by the expert of such a conclusion as to the disposition of the appellant to malinger as a basis, in whole or in part, for an opinion that Thomas was malingering about the injury to his hand can, *insofar as its prejudicial nature is concerned,* no more be the subject of judicial approval than could the admission of evidence of other acts offered for the purpose of showing the disposition or propensity of a party with respect to the particular kind of conduct involved in a civil case (*cf. Browning v. King,* 159 Cal.App.2d 326, 328-329 [324 P.2d 14]; *Marinucci v. Bryant,* 151 Cal.App.2d 298, 304 [311 P.2d 622]) or of evidence in a criminal prosecution of other acts which show merely criminal disposition. (See *People v. McCaughan,* 49 Cal.2d 409, 421 [317 P.2d 974]; *People v. Westek,* 31 Cal.2d 469, 476 [190 P.2d 9]; *People v. Albertson,* 23 Cal.2d 550, 576-577 [145 P.2d 7]; *People v. Kerfoot,* 184 Cal.App.2d 622, 647 [7 Cal.Rptr. 674].) Substantial error was committed by the trial court. (Cf. *People v. Clark,* 55 Cal.App. 42, 46-48 [203 P. 781].)

In stating his objections with respect to the evidence heretofore discussed, counsel for the appellant might have expressed the basis of inadmissibility more artfully and concisely. However, his objections were sufficient to preserve the rulings of the trial court for review since the evidence as to the appellant's military service and discharge therefrom in 1952 was inadmissible for any purpose whatsoever. (See *People v. Denne,* 141 Cal.App.2d 499, 512 [297 P.2d 451]; *People v. Porter,* 82 Cal.App.2d 585, 588 [186 P.2d 704]; cf. *People v. Bob,* 29 Cal.2d 321, 325-327 [175 P.2d 12].) Any amplification of the appellant's objection to such evidence would have served no useful end. Apropos is the following statement found in *People v. Cotton,* 117 Cal.App. 469 [4 P.2d 247], at page 472: "But it is obvious that, with whatever particularity or definiteness any objection might have been made to the admission of evidence of the character of that here under consideration, the defect in its foundation could not have been either readily or at all cured. No amplification of the objection made by defendant to the offered evidence either could or would have aided the prosecution to the extent that either by reframing the question, or by laying a broader or a different foundation therefor, the ultimate fact would have been admissible against defendant."

There remains for consideration the problem of

whether the evidence improperly received resulted in a miscarriage of justice. In resolving that question, this court cannot overlook the fact that the evidence against the appellant was entirely circumstantial in nature. The effect of any substantial error in the admission of evidence having a tendency to cause the jury to discredit the testimony of the appellant must be carefully considered. (See *People* v. *Weatherford*, 27 Cal.2d 401, 403 [164 P.2d 753].) Such consideration has led this court to the conclusion that a miscarriage of justice did occur because it is reasonably probable that a result more favorable to the appellant would have been reached in the absence of the evidence erroneously received. (See *People* v. *Watson*, 46 Cal.2d 818, 834-837 [299 P.2d 243].) Accordingly, the duty of this court is to reverse the judgment.

While other claims of error are made by the appellant, it is not necessary to consider them in view of the determination hereinabove set forth and since they relate to problems not likely to recur upon a retrial.

. The judgment and the order denying the motion for a new trial are reversed.

Shinn, P. J., and Files, J., concurred.